# United States Court of Appeals
## For the First Circuit

No. 02-1640

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee,

v.

MARTIN D. FIFE and FAROUK KHAN,

Defendants, Appellants.

DENNIS S. HERULA, MARY LEE CAPALBO (AKA MARY LEE CAPALBO HERULA), SEAVIEW DEVELOPMENT & HOLDINGS, LTD., MICHAEL CLARKE, ROBERT WACHTEL, JOHAN HERTZOG, and CHARLES SULLIVAN,

Defendants,

and

DAVID ULLOM,

Relief-Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Torruella, Circuit Judge,
B. Fletcher,[*] Senior Circuit Judge,
and Stahl, Senior Circuit Judge.

---

[*]Hon. Betty B. Fletcher, of the Ninth Circuit, sitting by designation.

       Donald S. Zakarin, Pryor Cashman Sherman & Flynn LLP,
with whom Matthew F. Medeiros, Little, Bulman, Medeiros, & Whitney,
P.C. were on brief, for appellant.
       Mark Pennington, with whom Giovanni P. Prezioso, Meyer
Eisenberg, and Eric Summergrad were on brief, for appellees.

November 6, 2002

**B. FLETCHER, <u>Senior Circuit Judge</u>**. Defendants-Appellants Martin D. Fife ("Fife") and Farouk Khan ("Khan") appeal the district court's order granting a preliminary injunction prohibiting further violations of securities law and a freeze against defendants-appellants' assets and other assets in defendants-appellants' possession. They contend that the district court erred and abused its discretion in finding that the Securities and Exchange Commission ("SEC") established a substantial likelihood of success in proving that defendants-appellants violated the anti-fraud provisions of the federal securities laws. We have jurisdiction pursuant to 28 U.S.C. § 1292. For the reasons stated below, we affirm the preliminary injunction and asset freeze against Fife and Khan.

## I.   FACTS AND PROCEDURAL BACKGROUND

This case arises from the alleged misappropriation of investor funds and the alleged fraudulent offering of securities in connection with an investment program operated by Fife through the entities Brite Business S.A., Brite Business Corporation and Seaview Development and Holdings, Ltd. ("Seaview").

### A.   The Investors

During 1999 and 2000, Michael A. Clarke ("Clarke") raised approximately $51.75 million from five investors under Brite Business, S.A. and later through Brite Business Corporation. Clarke promised extraordinary returns, such as generating a $20

-3-

million dollar profit in the first twelve banking days.  The five investors, with the corresponding amounts invested, are:  (1) William Britt, a U.S. citizen who invested through his entity, Beehive International, LLC ($10 Million); (2) Four Star Financial Services, LLC, a U.S. entity ($11.75 million); (3) Robert Burr, a U.S. citizen who invested through his entity, Trigon Capital ($10 million); (4) Rashad Mohamed Mahran Al Bloushi ("Al Bloushi"), an individual from the United Arab Emirates ($7.5 million); and (5) Rheaume Holdings, Ltd. ("Rheaume"), a British Virgin Islands entity ($12.5 million).  Another investor, Malcolm Monlezun ("Monlezun"), invested $1 million in November of 2000.

## B.  Fife's Involvement

Fife agreed to manage and invest Brite Business funds, in return for which he would receive a commission.  In the SEC investigation, Fife testified that his duties were to "administer the bank accounts that [he] had signatory power over and to develop a balance sheet enhancement program with leverage[d] funds sent in to be used for financial projects."[1]  Fife's balance sheet enhancement program involved pooling investors' money and then leveraging the money by purchasing treasury bills in order to qualify for third world development projects.  The profits from the

---

[1] The SEC formally initiated an investigation entitled In the Matter of Brite Business Corporation on December 21, 2001.  The investigation included conducting sworn investigative depositions.  After several of these investigative depositions, the SEC filed the present case in federal district court.

investment in the third world development projects would then be distributed to the investors. Fife claimed that investors would make returns of between 30 and 100 percent per year. These returns, however, were not guaranteed because of risks involved.

In October 1999, Fife established a brokerage account at the Rhode Island branch office of Raymond James Financial Services, Inc. ("Raymond James"), a securities broker-dealer, in the name of Brite Corp. Fife was the signatory on the account, and Fife's acquaintance, Dennis S. Herula ("Herula"), was the designated registered representative. Approximately $44.5 million of the $51.75 million raised for Brite Corp. was deposited into this account.[2]

Mary Lee Capalbo ("Capalbo"), an attorney and the wife of Herula, established a separate brokerage account at Raymond James entitled the "Mary Lee Capalbo Esq. Special Client Account" ("Capalbo Account"). Capalbo was the signatory on this account. Fife transferred $15.5 million from the Brite account at Raymond James into the Capalbo Account at Raymond James. These transfers occurred through five transactions between April 2000 and September

---

[2] The following deposits were made into the Brite account at Raymond James: (1) In October 1999, $7.5 million of investor funds from Al Bloushi; (2) In December 1999, $10 million of investor funds from Beehive; (3) In March 2000, $7 million of investor funds from Four Star; (4) In March 2000, $10 million of investor funds from Trigon; and (5) In March 2000, $12.5 million of investor funds from Rheaume.

2000.[3]   After these transfers, $29 million remained in the Brite Account at Raymond James under Fife's supervision.

Of the $29 million remaining in the Brite account at Raymond James, $27.3 million was returned to investors.[4] Approximately $20.5 million in principal plus promised return allegedly has been lost. Al Bloushi has received only $200,000 of his $5 million investment, and Rheaume has received only $4,500 from its $12.5 million investment.[5] As of September 18, 2000, all of the investment money under Fife's control in the Brite Account at Raymond James had been transferred out. The money deposited in the Capalbo Account was used to purchase shares in a money market mutual fund. An additional investor, Monlezun, invested $1 million raising the total amount of investor funds in the Capalbo Account

---

[3] The date of the transfers with the corresponding amounts are as follows: (1) March 31, 2000: $5.5 million; (2) April 6, 2000: $4.5 million; (3) April 14, 2000: $4.5 million; (4) August 4, 2000: $972,318; and (5) September 18, 2000: $11,201.

[4] The following amounts were returned/paid to investors: (1) Beehive received $10.1 million on its $10 million investment; (2) Four Star received $7 million of its $7 million investment from the Brite Account at Raymond James and then an additional $1.5 million interest payment from the Capalbo account at Raymond James; (3) Trigon received $10,000,095 on its $10 million investment; (4) Al Bloushi received $200,000 of his $7.5 million investment from the Capalbo Account at Raymond James; (5) Rheaume received $4,500 of its $12.5 million investment; and (6) Monlezun received $125,000 of his $1 million investment.

[5] According to the Raymond James account statement for Monlezun, one million dollars was transferred out of that account in November 2000.

at Raymond James to $16.5 million.[6]   Monlezun received only $125,000 from his $1 million investment.

From June 2000 to November 2000, $8 million of Brite investor funds was paid to various entities including Seaview[7], Tamini[8], Sullivan[9], Puffin[10], Brite, Commonwealth, Four Star[11], and Al Bloushi.  Additional transfers in the amount of $8.6 million were made to the Mary Lee Capalbo "Special Client Account" at Citizens Bank.

## C. Rheaume Agreement

Brite entered into an agreement in March 2000 with Rheaume Holdings ("Agreement").  The Agreement stated that "'Brite' will attempt to pay benefits on a best efforts basis at a minimum average over a 90 day period of 10% per week of the amount invested."  According to the Agreement, the first payment should

---

[6]   This investment was transferred into the Capalbo account at Raymond James in November 2000.

[7]  From January 2000 to September 2001, Fife loaned Khan, on behalf of Seaview, $195,000.  This loan has not been repaid.

[8]  In June 2000, Fife paid the Tamini Group $2.245 million for initial fees for an enhancement program.  The program was not successful, and the money was lost.

[9]  In June 2000, Fife loaned Sullivan $350,000 of investors' money for personal needs.  This loan was not repaid.

[10]  In August 2000, Fife paid Puffin $2 million for initial fees for an enhancement program.  Puffin was a fraud and the money was lost.

[11]  In addition, Four Star received an additional $1.5 million interest payment from the Capalbo Account at Raymond James.

have occurred twelve international banking days from the receipt of Rheaume's deposit by Raymond James.

On May 8, 2000, Fife wrote a letter to Rheaume ensuring "the safety, security, monitoring and auditing of our client funds is and always will be my primary function. So without hesitation I state to you that absolutely your deposit is safe, secure, unencumbered, will not be invested without your authorization, can not be moved, or withdrawn without your approval." With regard to the enhancement program, Fife stated, "I myself have been successful for the past six months doing the same placement of funds." The letter further represented that there would be "no risk of loss" and that Rheaume would receive benefits from its investment in the next two weeks.

Almost immediately after Rheaume's investment was in Fife's control, Fife began transferring funds from the Brite Account at Raymond James into the Capalbo Account at Raymond James. These funds were transferred without Rheaume's knowledge or authorization. The funds in the Capalbo Account were invested in securities without Rheaume's knowledge or authorization, and funds in the Capalbo Account were thereafter transferred into another Capalbo Account at Citizen's Bank without Rheaume's knowledge or authorization. Moreover, Fife no longer had direct control over the investments since he was not a signatory on the accounts.

In July 2000, Robert Curl ("Curl"), Rheaume's

-8-

representative, requested a report of the balance in Rheaume's account. Fife forwarded letters from Herula to Curl on Raymond James letterhead reporting Rheaume's investment plus accrued interest in the Brite Account at Raymond James. However, these reports were false since the funds in the Brite Account were nearly depleted. After several months, Curl requested the return of Rheaume's funds. Fife told Curl that the money could not be returned because Raymond James worried about large sums of cash coming in and going out of an account in a short period of time. This statement was false.

A few months later, Fife suggested to Rheaume that it transfer its $12.5 million investment plus accrued interest in the Brite Account at Raymond James to an account at Charles Schwab in order to facilitate a "swift return." In December 2000, Fife advised Curl that the money was transferred to a Capalbo Account at Charles Schwab. Charles Schwab account statements were forwarded to Rheaume by Fife.

Throughout 2001, Fife, Herula, and Capalbo sent Curl forged Charles Schwab account statements showing upwards of $59 million in the account. Curl was told that Rheaume's investment plus accrued interest was now pooled with other investor funds in the Capalbo Account at Charles Schwab, and these funds would eventually be transferred to Fife's trading program at Seaview.

These funds, however, were never moved to Charles Schwab.[12]

After these funds were allegedly placed in the Charles Schwab account, Curl again requested the return of Rheaume's funds. Fife then advised Curl that the National Association of Securities Dealers ("NASD") had frozen the account. The NASD, however, never froze this account. Fife offered to use Rheaume's money in other finance deals once the NASD released the money in the Charles Schwab Account. Fife stated that he would be able to use Rheaume's money to generate excellent returns on other project finance deals.

### D. Seaview

Khan and Fife were business partners in Seaview. Seaview was loaned $195,000 of Brite's investor money from Fife. Seaview's start-up costs were obtained from Brite. When Brite dissolved, Brite's money was moved into an account at Seaview. Seaview offered the same type of balance sheet enhancement program that Fife envisioned for Brite's investors.

### E. Khan's Involvement

Khan engages in project financing and project development work. As Fife's partner at Seaview, Khan engaged in various tasks on behalf of the entity. Khan wrote a letter to Herula describing the "investment program" regarding the leveraging of monies. Once

---

[12] In 2001, Rheaume's money had already been moved at least twice without authorization. Moreover, there was no activity in the Capalbo Account at Charles Schwab from January 2001 to April 2001.

leveraged through balance sheet enhancement, the money would be used towards project finance. Khan signed several letters directed to potential investors in the balance sheet enhancement program. The SEC claims that these letters were intentionally aimed to mislead potential investors. There is no proof that these letters were mailed; however, a similar proposal was mailed to Al Bloushi, one of Brite's investors.

In December 2001, Khan sent letters to Al Bloushi and his representative in an attempt to convince Al Bloushi to invest additional funds in the amount of $100 million dollars in a private placement project finance program. One letter promised that Al Bloushi would receive a guaranteed return of 7% per year, *without any risk*. In addition, Al Bloushi would receive a reward for holding the investment for a year and a day. This reward included a 20% return on the 30th day of the trading cycle and an 80% return on the investment that was to be paid in four installments of 20% each.

In the SEC investigation, Khan testified that he told Al Bloushi's representative that if an investment were made, he was *guaranteed* a return. This representation was material since project finance is very risky. If a project finance investment fails, then the investor receives nothing. Khan testified that "[t]he risks are high, the rewards are high. There's a risk/reward relationship on every, every transaction. There's tremendous

amount of risks involved: there's tremendous amount of rewards to be made. The investor has to be a sophisticated investor." Although Khan testified that he informs investors of the risks of project finance, these risks were not included in the project proposal sent to Al Bloushi.

## F. Procedural Background

The SEC filed this action alleging that nine defendants, including appellants Fife and Khan, violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5; section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); and, as against Fife individually, section 206 of the Investment Advisers Act, 15 U.S.C. § 80b; requesting disgorgement of the defendants' "ill-gotten gains"; and requesting the imposition of a civil monetary penalty.[13] The SEC requested an ex parte preliminary injunction to prohibit defendants from further violations of the federal

---

[13] The Defendants include the following individuals: Michael Clarke, founder of Brite Business, S.A., a British Virgin Islands Corporation; Charles W. Sullivan, incorporated Brite Business Corporation in Delaware in 1999; Johan C. Hertzog, represented to clients that returns on investments would be extraordinary; Robert M. Wachtel, the U.S. representative of Brite Business, solicited Brite Business investor Rheaume; Martin Fife, identified himself as President of Brite Business Corporation and managed investor funds; Khan; Dennis S. Herula, a registered representative at Raymond James from August 1999 until January 2001; Seaview Development and Holdings, Ltd., a private business incorporated by Fife and Khan to administer balance sheet enhancement programs; and Mary Lee Capalbo, Herula's wife, the attorney in control of Brite investor funds.

securities laws as alleged in the complaint, and an order freezing defendants' assets and other assets in defendants' possession, as well as $190,000 held by relief defendant David L. Ullom.[14] The district court granted the preliminary injunction and asset freeze as to defendants Herula, Capalbo, Fife, Khan, and Seaview. The court found that Fife and Khan were the alter egos of Seaview. This appeal ensued.

## II.  STANDARD OF REVIEW

We review the grant or denial of a preliminary injunction for abuse of discretion; legal issues are reviewed de novo, and findings of fact are reviewed for clear error. Lanier Prof'l Servs. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999).

## III.  DISCUSSION

The SEC has authority under the Securities Exchange Act to bring an action in district court to enjoin individuals from engaging "in acts or practices constituting a violation of any provision" of the securities laws. 15 U.S.C. § 78u(d). In Aaron v. SEC, 446 U.S. 680 (1980), the Supreme Court stated that the district court shall grant such an injunction "upon a proper showing." Id. at 689. The requisite elements of "a proper showing" include, "at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of either one of

---

[14] Ullom acquired Brite Business investor funds in return for no services being performed.

the Acts or of the regulations promulgated thereunder." Id. at 700-01.

In this circuit, a preliminary injunction may be granted if the movant shows a likelihood of success on the merits, a risk of irreparable harm, a favorable balance of equities, and that the injunction would be in the public interest. Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000). The "sine qua non" of a preliminary injunction analysis is whether the plaintiff is likely to succeed on the merits of its claim. Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993).

In the instant case, the district court applied the criteria mandated by the Second Circuit in SEC preliminary injunction actions, see SEC v. Unifund SAL, 910 F.2d 1028, 1036-37 (2nd Cir. 1990), and failed to consider the risk of irreparable harm. Unlike the Second Circuit, we require consideration of irreparable harm in actions initiated by the SEC. SEC v. World Radio Mission, 544 F.2d 535, 541-42 (1st Cir. 1976) (finding that the district court properly considered the "balance of the harms which would result from the grant or denial of preliminary relief," but failed to pursue plaintiff's chances of ultimate success); see also SEC v. Lehman Brothers, Inc., 157 F.3d 2, 9 (1st Cir. 1998) (finding that there was no obvious harm in allowing appellant lienholder to maintain the escrow allegedly secured by debtor through unlawful insider trading). Although the district court

-14-

failed to consider irreparable harm in granting the preliminary injunction, the essential requirement--finding that the SEC is likely to succeed on the merits of its claim--was met. Weaver, 984 F.2d at 12; Aaron, 446 U.S. at 700-01. The district court found that "Fife misrepresented the nature of the investment program, its overall risk, and the status of funds after they were placed" with Brite, and that the SEC established that Khan engaged in a course of business that would operate as a fraud or deceit upon the purchaser. Moreover, "[t]he district court's amply supported finding of the likelihood that future violations would occur would ordinarily, without more, entitle plaintiff to a preliminary injunction." World Radio Mission, 544 F.2d at 541. The district court here found that the SEC would likely succeed in showing such future violations because of the nature of Fife and Khan's occupations, their claims of ignorance as to the scheme, the misappropriation of large amounts of investor funds, the recency of their alleged conduct, and the continuing existence of the accounts and entities used to perpetrate the alleged scheme in this case.

We may affirm the district court's grant of a preliminary injunction and asset freeze on any grounds supported by the record. Aldridge v. A.T. Cross Corp., 284 F.3d 72, 84 (1st Cir. 2002) (quoting Greenless v. Almond, 277 F.3d 601, 605 (1st Cir. 2002)). The record sufficiently establishes "the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of

-15-

eventual success on the merits, outweighs the harm the injunction will cause [appellants]." Vargas-Figueroa v. Saldana, 826 F.2d 160, 162 (1st Cir. 1987) (emphasis in original); accord Commonwealth of Massachusetts v. Watt, 716 F.2d 946, 953 (1st Cir. 1983); cf. World Radio Mission, 544 F.2d at 541 ("To the extent that a defendant can show harm, this must be discounted by the degree that a plaintiff can show likelihood of success."). Accordingly, we must affirm the preliminary injunction and asset freeze unless the district court abused its discretion.

### A. Requirements and Evidence of Violations of the Anti-Fraud Provisions of the Securities Laws

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), in relevant part, provides:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly--
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (3) to engage in any transportation, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Id. Under section 17(a) of the Securities Act, "[s]pecific reliance by the investor need not be shown." United States v.

-16-

Ashdown, 509 F.2d 793, 799 (5th Cir. 1975). Negligence is sufficient to establish liability under section 17(a)(2). Aaron, 446 U.S. at 695-697.

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), makes it "unlawful for any person, directly or indirectly, . . . to use . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Id. The SEC promulgated Rule 10b-5 under the Securities Exchange Act, 15 U.S.C. § 78j(b). Pursuant to this rule, it shall be unlawful for any person:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. 240.10b-5. A statement is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether or not to invest his money in a

particular security.  See Basic v. Levinson, 485 U.S. 224, 231-232 (1988).

Under section 10(b) and rule 10b-5, the defendants must act with scienter.  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  The plaintiff must demonstrate that the defendants acted with a high degree of recklessness or consciously intended to defraud.  Aldridge, 284 F.3d at 82.  Recklessness is "a highly unreasonable omission, involving not merely simple, or even inexcusable[] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it."  Greebel v. FTP Software, 194 F.3d 185, 198 (1st Cir. 1999) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)).

Fife and Khan assert that they did not act with the requisite degree of scienter.  This argument fails.  Fife and Khan made material representations, either recklessly or with scienter, with regard to the sale and offer of securities and made misleading and false statements to investors.

During the two and a half years that Fife controlled the Raymond James account, he made only two purchases in the Brite balance sheet enhancement program; both purchases were for treasury bills, one on margin and the other for cash.  Fife lost

approximately $1.7 million in one of these treasury bill purchases. Fife did not use investor funds to participate in third world projects, the underlying premise of the enhancement program. Further, during Fife's control of investor funds, $20.5 million of investor funds were dissipated.

Although Fife alleges that he never saw any investor contracts between Brite and its investors, his letter to Rheaume indicates that he was at least aware of some of the Agreement's terms by using some of the contract language in his letter such as "private placement by invitation for qualified clients" and "without putting its funds at risk." At the time the letter was written, Fife had already transferred and invested Rheaume's money without prior authorization. He had not been successful in his balance sheet enhancement program in the previous six months, and a very great risk of loss accompanied participation in the balance sheet enhancement program. Thus, Fife's statements were material misrepresentations.

Since Fife and Khan were partners engaging in balance sheet enhancement programs, they knew of the risks involved in participating in these programs, failed to inform investors of these risks, and positively represented that there was no risk. If a project did not succeed, the investor would not receive back his investment or any return on his investment principal. Instead of advising clients of these risks, they promised high returns. Both

Fife and Khan contacted Brite investors soliciting additional opportunities to invest funds without disclosing the high risks associated with the balance sheet enhancement program. These misrepresentations and omissions were material because a reasonable investor would want to know the risks involved in the balance sheet enhancement program. See Basic, 485 U.S. at 231. Moreover, Fife repeatedly made false representations to Brite investor, Rheaume, concerning the management of its investment funds.

The SEC made a sufficient showing that Fife and Khan made material misrepresentations in connection with the purchase or sale of securities in interstate commerce under the balance sheet enhancement program. In view of defendants' past conduct, the defendants' occupations, and their continued defense that their past conduct was blameless, we conclude that the SEC made an adequate showing that repetition of such conduct in the future is reasonably likely. Therefore, the district court's grant of a preliminary injunction as to Fife and Khan under the section 17(a) of the Securities Act and section 10(b) of the Securities Exchange Act was not an abuse of discretion.

**B. Requirements and Evidence of Violations of Section 206 of the Investment Advisers Act**

Section 202(a)(11) of the Investment Advisers Act defines the term "Investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or

as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2 (a)(11). The Investment Advisers Act prohibits fraud by those who act as investment advisers. 15 U.S.C. § 80b-1. Fife asserts that he is not an Investment Adviser under the statutory definition and therefore, could not have violated the act.

The district court found sufficient evidence to hold that the SEC met its burden of demonstrating that it is likely to succeed in proving that Fife violated sections 206(1) and 206(2) of the Investment Advisers Act. First, Fife advised Curl regarding Rheaume's investment. Second, Fife's fraudulent conduct was in connection with the offer, purchase, or sale of securities. Fife made various transfers of Rheaume's money without prior authorization, invested money in money market accounts without prior authorization, and falsely represented the status of Rheaume's funds. The Supreme Court concluded that "Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation enacted for the purpose of avoiding frauds, not technically and restrictively, but flexibly to effectuate its remedial purposes." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963) (internal quotation marks omitted). Third, although Fife has not yet received compensation, he understood that he would be compensated for his efforts by a commission based on a percentage of the profits from the

investments, *if successful*, pursuant to a formula to be agreed upon at a later time. Therefore, the district court did not err in holding that the SEC set forth a substantial likelihood of success against Fife under the Investment Advisers Act.

### C. Asset Freeze

The district court found that the order freezing the defendants' assets appropriate because of the high risk that any remaining investment funds or proceeds thereof would be further depleted without such an order. The record illuminates misrepresentations and omissions concerning the offer or sale of securities. Under these circumstances, there is simply no viable argument that an asset freeze was an abuse of discretion. Rizek v. SEC, 215 F.3d 157, 163 (1st Cir. 2000).

### IV. CONCLUSION

The asset freeze and preliminary injunction enjoining Fife and Khan from further violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) are affirmed. The preliminary injunction enjoining Fife from further violations of section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b is affirmed.