# United States Court of Appeals
## For the First Circuit

---

Nos. 04-1933
     04-2047

OTIS ELEVATOR COMPANY,

Plaintiff-Appellant/Cross-Appellee,

v.

INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, LOCAL 4;
MICHAEL LANGER, Individually and as Business Manager;
KEVIN MCGETTIGAN, Individually and as Business Representative;
and STEVE MORSE, Individually and as Business Representative,

Defendants-Appellees/Cross-Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

---

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Timothy E. Copeland, Jr., with whom Downs Rachllin Martin
PLLC, Peter B. Robb, Shari S. Sobel, Morgan, Brown & Joy, LLP and
Nathan L. Kaitz were on brief, for appellant/cross-appellee.
     Paul F. Kelly, with whom Stephanie R. Pratt and Segal, Roitman
& Coleman were on brief, for appellees/cross-appellants.

---

May 11, 2005

---

**TORRUELLA**, **Circuit Judge**.  This case is before us on interlocutory cross-appeals pursuant to 28 U.S.C. § 1292(a)(1),[1] as a result of the district court's grant of a preliminary injunction under the aegis of Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235 (1970) (finding jurisdiction to enjoin a labor organization from engaging in a work stoppage over a dispute subject to arbitration under the governing collective bargaining agreement).

## I.  Background

Plaintiff-Appellant/Cross-Appellee Otis Elevator Company ("Otis") constructs and services elevators throughout the United States, including in Massachusetts, New Hampshire and Maine.  Otis employs elevator mechanics, helpers and apprentices, all of whom are represented for collective bargaining purposes by the International Union of Elevator Constructors ("IUEC") on behalf of its locals, including Defendant-Appellee/Cross-Appellant IUEC Local 4 ("Local 4").[2]

---

[1]  "[C]ourts of appeal shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions."

[2]  Also appearing as Defendants-Appellees/Cross-Appellants are Michael Langer, Kevin McGettigan, and Steve Morse in their individual and official capacities as officials of Local 4.  The term "Local 4" used herein includes the individually named defendants in addition to the local union.

## A.   The Collective Bargaining Agreement

On July 9, 2002, Otis and IUEC, on behalf of Local 4 and other local unions, entered into a five-year collective bargaining agreement ("the Agreement") that covers all of Otis' elevator employees in Massachusetts, New Hampshire and Maine.  The Agreement contains three provisions central to the present appeals.

The first is Article XIV ("Strikes and Lockouts"), which prohibits strikes or lockouts during the life of the Agreement, provided the parties comply with the terms therein.  The second is Article IV, paragraph 11, which deals with the processing of grievances related to Article IV ("Work Jurisdiction") and Article IV(A) ("Systems, Modular, and Industrial Structures"), which specify the work that the parties have agreed will be performed by IUEC members under the Agreement.  Article IV, paragraph 11(a) requires that such disputes "be settled in accordance with the grievance procedures in Article XV."  Paragraph 11(b) stipulates that while work disputes are "being processed [Otis], where possible, shall assign the employees work other than the work in dispute."  However, "[w]here the work has progressed to a point where it is not possible to perform work other than the work in dispute, then the employees shall perform the disputed work pending final resolution as provided herein."  Art. IV, para. 11(b).

Finally, in Article XV ("Arbitration"), the parties unambiguously agreed that "[a]ny difference or dispute regarding

-3-

the application and construction of the Agreement" constitutes a "grievance" which "shall be resolved under the [procedures established therein]." Art. XV, para. 1. Article XV's grievance procedures constitute an elaborate, integrated and well-detailed process intended by the parties to provide a modicum of industrial justice in the workplace, while at the same time allowing for stability in the collective bargaining relationship.

"Any employee, local union, or [Otis]" has the right to initiate a grievance, first by presenting an oral complaint before a designated representative of Otis (or the IUEC, when Otis is the grievant) within ten working days of the grievance being known. Id. para. 2. If, after this initial interchange, the grievance remains unresolved, the aggrieved party has ten working days to formalize the complaint in a written form provided for such purposes, thus moving the grievance procedure to the next step. Id. para. 3.

At this point the matter is taken up by higher-level Otis and IUEC representatives, who must meet to again attempt to reach a mutually satisfactory solution of the grievance. Id. At this meeting, the responding party is obligated to answer the written complaint. Id. Within ten working days thereafter, Otis or the IUEC, as the case may be, may indicate its dissatisfaction with the opposing party's answer by notifying that party of its intention to

appeal from the decision. Id. Any grievance disposition not appealed to the next step is final and binding on all parties. Id.

If appealed, the grievance then moves to the next step in the process, in which the matter is placed on the agenda of a scheduled meeting of the National Arbitration Committee ("NAC").[3] Id. para. 4. At the NAC meeting, the responding party may make a written proposal for the disposition of the grievance. Id. If accepted by the opposing party, the solution becomes a final and binding disposition of the grievance on all parties. Id. If not accepted, the aggrieved side may notify the other in writing of its desire to seek arbitration of the grievance. Id.

The parties are then required to attempt to agree upon an impartial arbitrator. Id. para. 6. If unable to do so, they must jointly request arbitration before a member of the National Academy of Arbitrators, pursuant to the Labor Arbitration Rules and Procedures of the American Arbitration Association. Id. The decision of the arbitrator is final and binding on all parties. Id.

Although this is the mandatory procedure for the resolution of most grievances, Article XV, paragraph 9 also establishes an expedited arbitration procedure in the case of

---

[3] The NAC meets once every calendar quarter. On the employer's side, the NAC is composed of Otis Director of Labor Relations (or his designee) and two other Otis representatives, while the IUEC is represented by its General President (or his designee) and two other union representatives. Art. XV, para. 4.

-5-

grievances involving the discharge of an employee.  Within this limited subset, the parties have agreed to a fast-track procedure for discharge grievances not satisfactorily resolved after the matter is grieved in the formal written step.  Id. para. 9.  At this point, the controversy is directly referred for a discussion between Otis' Director of Labor Relations and the IUEC's General President, and if the matter is not resolved, either party may ask for "immediate, expedited impartial arbitration."  Id.

### B.   The Concerted Activities

The present appeals arise from a work stoppage directed by Local 4 against Otis that resulted from a dispute over the use of cranes to hoist and put in place elevator plunger/cylinder units.  Local 4 claims that this practice is prohibited by the collective bargaining contract, which, it alleges, only allows use of a crane to hoist "heavy material" -- a term that includes plunger/cylinder units -- outside of building structures.  It is Local 4's position that, inside buildings, these units must be hoisted manually.  Otis responds that the use of cranes to move the plunger/cylinder units in the manner to which Local 4 is now objecting has been Otis' long-standing practice, a practice which it alleges was acquiesced in by Local 4 until recently.  In fact, it claims, during the prior year alone, plunger/cylinder units for 50 to 60 elevators were installed with cranes.  Neither side filed

a grievance,[4] although Otis claims it offered to submit the dispute to expedited arbitration, a proposal that apparently was not acted upon by the IUEC. In fact, Local 4 officials have allegedly indicated that they will not file a grievance.

As is the case with many labor disputes, there is considerably more background to this controversy than meets the eye. Throughout the spring of 2004, there arose a series of work controversies between Otis and Local 4 in various sites throughout Massachusetts, New Hampshire and Maine, all of which "involved Otis' use of labor saving devices." Brief of Appellee/Cross-Appellant at 9. In April 2004, Otis unsuccessfully sought injunctive relief in the U.S. District Court for the District of Maine against Local 4 over alleged work stoppage activities related to disputes about safety precautions for union members working in elevator hoist ways. Otis Elevator Co. v. Local 4, Int'l Union of Elevator Constructors, No. 04-00074 (D. Me. Apr. 14, 2004) (transcript of conference in chambers) (finding no cause for granting equitable relief because the employees in question had already returned to work). Two days later, Otis again sought injunctive relief, this time for alleged work stoppage activities

---

[4] Local 4 had, however, previously filed grievances concerning disputes over the use of cranes for plunger/cylinder installation. On both prior occasions, Otis rejected the grievances, and Local 4 did not appeal to the next step of the Article XV procedure, thus rendering Otis' objection binding. See Letters of May 5 and May 7, 2004 from Dorothy L. Mynahan, Otis Branch Manager, to Michael Langer, IUEC.

related to the installation of prefabricated electronic components and pre-drilled, pre-tapped doors. Otis Elevator Co. v. Local 4, Int'l Union of Elevator Constructors, No. 04-00074 (D. Me. Apr. 16, 2004) (transcript of conference in chambers). The court again denied a temporary restraining order, as it appeared that other work could be continued while the dispute was addressed through the Agreement's grievance procedure. Id. at 23-25.

Thereafter, commencing on May 13, 2004, Otis elevator employees at the Bentley College work site in Waltham, Massachusetts reported being instructed by Local 4 officials to refuse to work, purportedly over the installation of certain pre-tapped elevator doors. The stoppage spread to other work sites in the Boston area, with an additional eighteen elevator employees eventually joining the refusal to work. On May 14, 2004, Otis sought injunctive relief in the U.S. District Court for the District of Massachusetts, as a result of which the court issued an order on May 19, 2004 requiring arbitration of the dispute and enjoining the work stoppage "pending resolution of all issues deemed by the arbitrator to be related to the dispute over the installation of the elevator car doors." Otis Elevator Co. v. Local 4, Int'l Union of Elevator Constructors, No. 04-10966 (D. Mass. May 19, 2004) (Order to Arbitrate and Restraining Order).

On May 26, 2004, as a result of instructions given by Local 4 officials to its members, Otis was unable to proceed with

the scheduled installation of plunger/cylinder units at four Boston-area job sites. Otis' operations were seriously disrupted, as were those of other contractors at the building sites. For example, at one job site, the contractor was forced to leave a hole open at the top of a completed building frame to permit installation of the plunger/cylinder unit at a later date. Finishing work in the building could not proceed until the top of the building was enclosed. According to Otis representatives, the work at the job sites in question had progressed to such a point that, until the plunger/cylinder units were installed, no other work was available to be assigned to the elevator mechanics. Thus, Otis claimed, two union members were sent home without pay for lack of work. Local 4 saw the matter differently.

By May 27, 2004, 90 of the 110 Local 4 members Otis employed in the Boston area, including all employees assigned to service elevators, were reporting "sick" or absent "for personal reasons." Otis was thus unable to respond to service calls involving elevator malfunctions, including two such calls from a hospital.

### C. The Boys Markets Injunction

Otis proceeded to file for injunctive relief in the District of Massachusetts under Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235 (1970). After a brief hearing on May 27, 2004, attended by attorneys for both parties and recessed

temporarily to allow the parties to submit proposed orders, the district judge signed Local 4's draft order, finding in relevant part: (1) that the parties had a collective bargaining agreement, which contained a no-strike clause and a grievance and arbitration provision applicable to the existing plunger/cylinder dispute; (2) that the parties were claiming mutual breaches of the collective bargaining agreement; and (3) that ordinary principles of equity warranted the granting of relief. Otis Elevator Co. v. Local 4, Int'l Union of Elevator Constructors, No. 04-11108 (D. Mass. Jun. 3, 2004) (Temporary Restraining Order); see also Boys Markets, Inc., 398 U.S. at 254 (adopting conditions for injunctive relief). The order, issued through June 7, 2004: (1) enjoined Local 4, and all in concert therewith, from striking or otherwise interfering with Otis' normal operations; (2) required the parties to arbitrate the plunger/cylinder dispute "pursuant to the Expedited Labor Arbitration Procedures of the American Arbitration Association"; and (3) restrained Otis from "imposing discipline on Local 4 members over contract disputes between Otis and Local 4, and from applying to the Court for further equitable relief unless it has first offered to Local 4 the opportunity to arbitrate the underlying dispute pursuant to the Expedited Labor Arbitration Procedures of the American Arbitration Association."

The court failed, however, to address Otis' objections to those parts of the order imposing expedited extra-contractual

arbitration of the plunger/cylinder dispute, and prohibiting disciplinary action against employees or the seeking of additional equitable relief, absent prior extra-contractual arbitration of said actions. Otis' protestations were again of no avail when the district court, on June 17, 2004, converted the temporary restraining order into a preliminary injunction containing substantially the same conditions.

These two issues constitute the principal questions raised by Otis' appeal.[5] The issues raised by Local 4's cross-appeal are better viewed as arguments in support of the district court's order than as objections to the same. Thus, our consideration of Local 4's cross-appeal is subsumed within, and will be addressed as part of, Otis' appeal.

## II. <u>Standard of Review</u>

A district court may grant a <u>Boys Markets</u> injunction provided the petitioner establishes that: (1) a collective bargaining agreement between the parties provides for mandatory

---

[5] Because we ultimately reverse those portions of the injunction directed against Otis, we need not consider its additional claim that the district court committed error in not granting an evidentiary hearing before issuing the preliminary injunction. <u>See</u> 29 U.S.C. § 107 (requiring hearing prior to issuance of an injunction in labor disputes). As to the portion of the preliminary injunction that we affirm -- the prohibition on further work stoppages by Local 4 -- no evidentiary hearing was necessary because the facts supporting that relief are not in dispute. <u>See</u> <u>Kansas City S. Transp. Co., Inc.</u> v. <u>Teamsters Local Union No. 41</u>, 126 F.3d 1059, 1067-68 (8th Cir. 1997) (holding that <u>if</u> 29 U.S.C. § 107 applies to <u>Boys Markets</u> injunctions, it does not require an evidentiary hearing when injunction is based on undisputed facts).

-11-

binding arbitration; (2) the dispute giving rise to the concerted action which is sought to be enjoined is subject to binding arbitration under that agreement; and (3) ordinary principles of equity warrant injunctive relief. Nat'l Elevator Indus. v. Int'l Union of Elevator Constructors, 776 F.2d 374, 376-77 (1st Cir. 1985).

The issuance of a Boys Markets injunction is reviewed, as in the case of other injunctions, for abuse of discretion. See Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 387-88 (1974); see also SEC v. Fife, 311 F.3d 1, 7 (1st Cir. 2002). Questions of law are reviewed de novo, and those of fact are subjected to a clear error standard. Fife, 311 F.3d at 7. There is an abuse of discretion by the trial court if an error of law is committed, or if it "considers improper criteria, ignores criteria that deserve significant weight, or [if it] gauges only the appropriate criteria but makes a clear error of judgment in assaying them." Rosario-Urdaz v. Rivera-Hernández, 350 F.3d 219, 221 (1st Cir. 2003).

With this framework of review to guide us, we turn to the actions of the district court in these appeals.

### III.  **Analysis**

#### A.  The **Quid Pro Quo**

Today, it is a fundamental principle of industrial relations in the United States that labor disputes are settled through voluntary arbitration rather than labor/management strife. Cf. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 458 (1957) (identifying "congressional policy toward settlement of labor disputes by arbitration").  As background to this principle, we note that the use of injunctions in labor disputes has evolved through various stages, commencing with an early period during which the organization of labor for collective bargaining purposes was considered a criminal enterprise, and the indiscriminate use of the labor injunction to stop these activities was the order of the day.  Cf. In re Debs, 158 U.S. 564, 586 (1895) (upholding President Cleveland's power to obtain an injunction against the Pullman Strike despite the absence of any statutory authority, on the grounds that "the wrongs complained of [were] such as affect[ed] the public at large").  In response to a period of considerable labor instability and unrest, Congress enacted the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101-115, which continues in effect to this day.  Nevertheless, changing times and the growing strength of the unions eventually led to a relaxation of these stringent standards via Section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a) (providing federal

courts jurisdiction to hear disputes arising from violation of collective bargaining agreements), as interpreted in Boys Markets, 398 U.S. at 250-54, to permit labor injunctions in limited circumstances.

This path has not been without bumps and bruises. All sides to labor strife have had to give some quid in exchange for some quo. To achieve a measure of labor peace and uninterrupted business operations, employers have had to surrender some of their traditional management prerogatives, subjecting many of these so-called rights to scrutiny and judgment before private, quasi-judicial fora in the form of arbitral tribunals. See Lincoln Mills, 353 U.S. at 455 ("Plainly the agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike."). The use of this voluntary system of dispute resolution is so prevalent today, not only in a labor relations setting, but in commerce and industry generally, as to hardly require further comment.

One cardinal principle, however, needs to be kept in mind when considering the issues before us. Notwithstanding our comprehensive system of labor relations legislation in the United States -- which, among other things, establishes the right of employees to organize and negotiate with employers for collective bargaining purposes, 29 U.S.C. § 157 -- with few exceptions, the contents of collective bargaining agreements are left to the

-14-

discretion and negotiating strength of the parties, see id. § 158 (d). That is, it is ultimately up to the parties to a collective bargaining agreement to determine what working conditions and similar matters they wish to agree upon, and make part of, their contractual relationship. This includes which method, if any, they will use to resolve disputes that arise during the course of their collective bargaining agreement. While there is no legal requirement that employers and unions include a grievance and arbitration procedure in their collective bargaining agreement, it seems that, in practice, almost all such agreements today do include a grievance and arbitration procedure. However, this is just one of several items subject to mandatory negotiation, but which theoretically can be rejected by the parties from becoming part of the collective bargaining contract if they fail, in good faith, to agree on said provision. The point is that it is up to the negotiating parties whether or not to agree to have a formal method for settling their labor/management differences, and it is up to them, and only them, to determine what shall be the procedure. See id. §§ 158(a)(5), (b)(3), (d).

Once there is agreement, however, the chosen procedure is binding on the parties and subject to judicial enforcement. Id. at § 185. Compliance with agreed-upon grievance procedures is highly desirable from a public policy standpoint, to such a degree that if a collective bargaining contract has a binding grievance and

arbitration clause, Boys Markets relief is available even without the existence of a specific no-strike clause in the contract. Gateway Coal Co., 414 U.S. at 381; see also Boys Markets, 398 U.S. at 248 ("[A] no-strike obligation, express or implied, is the quid pro quo for an undertaking by the employer to submit grievance disputes to . . . arbitration.") (emphasis added). Once a court determines that a dispute between the parties is covered by a binding grievance and arbitration agreement between them, the court should enforce the arbitration provisions of that agreement. Lincoln Mills, 353 U.S. at 455 (stating that the Labor Relations Management Act "expresses a federal policy that federal courts should enforce [collective bargaining] agreements on behalf of or against labor organizations and that industrial peace can best be obtained only in that way"); Int'l Detective Serv., Inc. v. Int'l Bhd. of Teamsters, Local 251, 614 F.2d 29, 32 (1st Cir. 1980) ("The Supreme Court has consistently emphasized and promoted federal policy which encourages peaceful settlement of labor disputes through compelling arbitration under collective bargaining agreements.").

### B. The Injunction

In the instant case, the district court reached the essentially uncontested conclusion that a work stoppage was being promoted by Local 4 against Otis over the use of cranes to place plunger/cylinder units, a dispute subject to the grievance and

arbitration procedures detailed in Article XV of the Agreement. Both parties had agreed to use those procedures for resolving their disputes. Otis indicated its willingness to submit the dispute to the agreed process, but, for whatever reason, Local 4 chose not to avail itself of that process and instead promoted a concerted work stoppage in violation of the no-strike clause in Article XIV of the Agreement. The district court correctly enjoined the work stoppage, and rightly ordered the parties to submit the plunger/cylinder dispute to arbitration. It should have stopped there.

Unfortunately, the district court went further, and in doing so exceeded its discretion by requiring that the parties submit to an arbitration regime different than what was contractually bargained for. For example, Otis points out that the Expedited Labor Arbitration Procedures of the American Arbitration Association, unlike the arbitration procedures provided for in Article XV of the Agreement, do not permit the parties to choose the arbitrator and explicitly prohibit the filing of post-hearing briefs and the preparation of a stenographic record of the proceedings. The district court's abrogation of the regime contractually bargained for was inappropriate. Only the procedures of the Agreement, voluntarily agreed upon in good faith by the

parties, could be enforced by the court.[6]  It was beyond the district court's power to go further under the circumstances, and, in doing so, it contravened the policies promoted by <u>Boys Markets</u>, 398 U.S. at 248, and <u>Lincoln Mills</u>, 353 U.S. at 455.  The equitable powers of a court are not a warrant for reforming the conditions of a collective bargaining agreement.

The district court's intrusion into the disciplinary authority of Otis, restraining it from taking action against employees engaged in strike activity in violation of the no-strike clause, is also an abuse of discretion.  An employee who engages in such conduct engages in unprotected activity and as such may be subject to discipline.  <u>See</u> <u>Liberty Mut. Ins. Co.</u> v. <u>NLRB</u>, 592 F.2d 595, 604-05 (1st Cir. 1979) (upholding employer's right to discipline employee engaged in activities not protected by the National Labor Relations Act, including "activities . . . in breach of contract"); <u>see also</u> <u>NLRB</u> v. <u>Sands Mfg. Co.</u>, 306 U.S. 332, 344 (1939).  The employee may, of course, challenge such an accusation

---

[6]  We note that the Supreme Court approved an order, which did not preempt any previously agreed-upon procedure, that was issued to eliminate a potentially unsafe working condition pending arbitration.  <u>Gateway Coal Co.</u>, 414 U.S. 368 (approving court ordered suspension, pending arbitration, of foreman whom union believed to pose a safety risk).  No such order is at issue in the instant case.  Moreover, we express no view at this time on what limited measures to order expedition of existing grievance procedures, if any, lie within a court's equitable authority, nor on what circumstances justify their use.  <u>See</u> <u>Hanna Min. Co.</u> v. <u>United Steelworkers</u>, 464 F.2d 565, 569 (8th Cir. 1972).  The procedure ordered here diverged from that agreed upon by the parties in more than just the time requirements.

by use of the contract's grievance and arbitration procedure, but the district court exceeded its authority in preempting the normal and agreed upon process for dealing with such matters.

The district court's last imposition upon Otis, barring it from requesting further equitable relief from the court unless Otis first extends an offer to Local 4 to arbitrate the dispute pursuant to a procedure other than the one outlined in the Agreement, is on particularly shaky ground. A federal court's ability to restrict a litigant's access to the courts by issuing an injunction prohibiting any further filing, although not unheard of, can only be justified "in extreme circumstances involving groundless encroachment upon the limited time and resources of the court and other parties." Castro v. United States, 775 F.2d 399, 408 (1st Cir. 1985). The district court's cryptic orders give no explanation in support of this unusual directive, nor can we find any on the record unless we consider Otis' two prior requests for relief, previously described, as the sub silentio basis for its action. But "litigiousness alone will not support an injunction against a plaintiff." Pavilonis v. King, 626 F.2d 1075, 1079 (1st Cir. 1980). Otis' filings pale in comparison with those rare instances in which limitation of access to the courts has been justified. See, e.g., Castro, 775 F.2d at 409 (upholding injunction against further filings against employer for nonrenewal because multiple actions filed were intended only to harass,

contained virtually identical allegations, and were personally insulting to defendant and its counsel).

Considering the above, we **<u>affirm</u>** that part of the preliminary injunction which orders Local 4 to cease and desist from engaging in or promoting concerted activities against Otis, or in any way interfering with its normal operations. All other parts of the preliminary injunction issued on June 17, 2004 are **<u>reversed</u>**, and the matter is **<u>remanded</u>** for the district court to modify the preliminary injunction to indicate that any grievance by Local 4 concerning the use of a crane to hoist and place a plunger/cylinder unit must be processed as indicated in Article XV of the Agreement.

**<u>It is so ordered.  Costs are taxed against Local 4</u>**.