COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

George HEFFERNAN, Defendant.

No. CV 101–141.

United States District Court,
S.D. Georgia,
Augusta Division.

Feb. 18, 2003.

Kenneth D. Crowder, U.S. Attorney's Office, Augusta, GA, Theodore J. Dowd, U.S. Commodity Futures Trading Commission, Division of Enforcement, Washington, DC, for plaintiff.

Stephen E. Curry, Curry Law Firm, Augusta, GA, for defendant.

## ORDER

BOWEN, District Judge.

Plaintiff Commodity Futures Trading Commission ("the CFTC") alleges that Defendant George Heffernan ("Heffernan") violated (1) the Commodity Exchange Act ("CEA"), as amended, (2) various CFTC regulations, and (3) a September 6, 2000 CFTC consent order.[1] The CFTC now

---

1. This Court has jurisdiction pursuant to 7 U.S.C.A. § 13a–1 (West 1999 & Supp.2002)

moves for summary judgment on all of its claims. For reasons stated more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** the CFTC's motion for summary judgment. (Doc. No. 21.)

## I. BACKGROUND

Defendant Heffernan devised his own system for trading commodities futures contracts,[2] and then created a Web site for marketing the system to the public. The CFTC initiated an investigation of Heffernan's activities, which led to a settlement and a CFTC consent order finding Heffernan in violation of various sections of the CEA and certain CFTC regulations. After the consent order was issued, the CFTC alleges Heffernan continued to commit violations of the CEA, CFTC regulations, and the September 6 order. As a result of Heffernan's alleged continuing violations, the CFTC filed this action on September 11, 2001.

### A. The Accutrader Web Site

#### 1. Products and Services Sold on the Web Site

Defendant Heffernan has been and is the sole proprietor of an Internet business located at www.accutrader.com ("the Accutrader Web site"). (Pl.'s Ex. B[3] ¶¶ 1, 3, 9, 13.) As the owner, Heffernan controls both the operations of the Accutrader Web site and its content. (Id. ¶¶ 9 & 13.) On the Web site Heffernan attempts to sell three products or services to the public:

a. **The Accutrader Day Trading Technique for the S & P[4] and NYFE[5] Futures ("the Accutrader Technique"):** The Accutrader Technique is a commodity futures day trading technique used to purchase futures contracts. The Accutrader Technique provides its users with buy and sell signals for trading commodity futures contracts. (SMF ¶¶ 7 & 12.)[6]

b. **The Accutrader Day Trading School:** The Accutrader Day Trading School is an instructional course intended to teach participants how to apply the Accutrader Technique. (Id. ¶ 7.)

c. **The Live Trading Room:** The Live Trading Room is a subscription service to an Internet voice-streaming program, which enables subscribers to listen to Heffernan apply the Ac-

---

and 28 U.S.C.A. § 1331 (West 1993). See CFTC v. R.J. Fitzgerald & Co., 310 F.3d 1321, 1327 (11th Cir.2002).

**2.** A futures contract is defined as "[a]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) which obligates each party to the contract to fulfill the contract at the specified price; (3) which is used to assume or shift price risk; and (4) which may be satisfied by delivery or offset." The CFTC Glossary: A Layman's Guide to the Language of the Futures Industry, available at http://www.cftc.gov/opa/brochures/opaglossary.htm.

**3.** Plaintiff's exhibits were submitted in support of its motion for summary judgment.

**4.** Heffernan stated in a deposition conducted May 8, 2001 that the "subject matter" of the Accutrader Technique is "[d]ay trading the S & P [Standard and Poor's] futures index." (Heffernan Depo. (May 8, 2001) at 15 & 42.) He later clarified in a March 11, 2002 deposition that he specifically analyzed the S & P 500 Futures Index. (Heffernan Depo. (March 11, 2002) at 23.)

**5.** "NYFE" is the abbreviation for the New York Futures Exchange. See Meierfeld v. Geldermann, Inc., No. 95 Civ. 9911(DAB), 1996 WL 426362, at *1 (S.D.N.Y. July 30, 1996).

**6.** For citation purposes, the CFTC's Statement of Material Facts (Doc. No. 23) has been shortened to "SMF." A parallel citation to any admission by Heffernan of a material fact (Doc. No. 33) will not be made within this Order unless necessary.

cutrader Technique to recent commodity futures market data. (*Id.*) Based upon his application of the Accutrader Technique to market data, Heffernan identifies or recommends trades to Live Trading Room subscribers.[7] (*Id.* ¶ 16.) Heffernan can also utilize other non-Accutrader trading techniques in the Live Trading Room, such as the "open trade"[8] or "trend trade,"[9] to recommend or identify trades to subscribers of the Live Trading Room.[10] (*Id.* ¶ 18.) The Live Trading Room was offered for a $500 monthly subscription between March 2000 and September 11, 2001, and there was at least one subscriber during each month of this time period. (*Id.* ¶ 21.)

Heffernan accepted credit card payments for Accutrader products and services. (Heffernan Depo. (March 11, 2002) at 106–07.)

7. The parties dispute the proper characterization of Heffernan's activities in the Live Trading Room. In its Statement of Material Facts, the CFTC states that "Heffernan recommends trades to Live Trading Room subscribers." (SMF ¶ 16.) Heffernan specifically refuted the CFTC's terminology: "Heffernan identified trading opportunities for trading purposes. He did not recommend or endorse specific trades, though he did identify trading opportunities and indicated when conditions looked favorable under his methods." (Doc. No. 33 ¶ 16.)

8. An "open trade" was defined by Heffernan in a June 13, 2001 deposition:
 MR. DOWD: What is an opening trade? Can you describe that for us?
 THE WITNESS: Sure. That's one of the bonus trades. The opening trade is where I buy or sell on the opening.... And all it is, I buy or sell on the open. It's a judgment call based on all the world markets, what they did that day, the previous day, any overseas markets what they did prior to our market opening and our night session. And what I'll do is determine a bias there. Is there more momentum for the market to move up or down on the open. So once I

## 2. Heffernan's Trading History

In addition to selling Accutrader products and services, Heffernan also traded futures contracts for certain clients and on his own behalf.

Heffernan managed two accounts for Lind Waldock & Company. From March 1, 1999 through April 30, 1999, Heffernan exercised trading authority over Lind Waldock & Company account 91NAA 705895. (SMF ¶¶ 30–31.) During March 1999, the account netted a loss of $1,446.60. (*Id.* ¶ 32.) Heffernan also managed account number 711585, another Lind Waldock & Company account, which opened on August 12, 1999. The last activity on this account occurred on May 12, 2000. (*Id.* ¶ 33.) In six of the nine months in which account 711585 was actively traded, the net result was a loss. (*Id.* ¶ 34.) Over the life of the account, net losses totaled $4,027.46. (*Id.* ¶ 35.)[11]

determine that bias, then I'll say we have a buy on the open or sell on the open.
(Heffernan Depo. (June 13, 2001) at 292–93.)

9. The record does not contain a detailed definition of a "trend trade," but Heffernan states that a "trend trade" is a bonus trade rather than an Accutrader trade. (Heffernan Depo. (March 11, 2002) at 60; Heffernan Depo. (June 13, 2001) at 175–76.)

10. Heffernan states that not every "trade" offered in the Live Trading Room is an "Accutrader" trade: "We have the Accutrader trades and also the bonus trades that I do in the room that are not Accutrader trades. In other words, we do also have bonus trades, trend trades, an opening trade, and then a couple of other trades that are very accurate that we'll do in addition to the Accutrader trades." (Heffernan Depo. (June 13, 2001) at 175–76.)

11. Heffernan admits the losses, but states that he "was not just using the Accutrader technique. He was also testing new techniques." (Doc. No. 33 ¶¶ 33–35.) Heffernan makes the same assertion in regard to both the Peregrin Financial Group account (*id.* ¶¶ 37 & 38) and his personal account (*id.* ¶ 39).

In addition, Heffernan exercised exclusive control over account number E15–14710, for the Peregrin Financial Group, from May 8, 2000 through September 11, 2001. (*Id.* ¶ 36.) In six of the eight months in which trading activity occurred for account E15–14710, the net result was a loss. (*Id.* ¶ 37.) The net result from May 8, 2000 through September 11, 2000 was a loss of $17,432.50. (*Id.* ¶ 38.)

Finally, from September 1999 to January 2001, Heffernan traded futures contracts on his own account and lost over $20,000. (*Id.* ¶ 39.) Heffernan did not inform prospective clients of his personal trading losses (*id.* ¶ 40.), and over any four-month period of time, Heffernan's futures trading in any commodity futures trading account failed to produce a net profit (*id.* ¶ 43).

## B. The CFTC's September 6, 2000 Order

On September 6, 2000, the CFTC determined that Heffernan's Accutrader Web site contained several misleading representations. Specifically, the following information allegedly posted on the Accutrader Web site formed the basis for a CFTC "cease and desist" order:

a. A statement that the Accutrader Technique was 85% accurate. The CFTC contended Heffernan did not have a basis for such a claim. (Pl.'s Ex. C at 2.)

b. A table purporting to display successful results of trading using the Accutrader Technique. (*Id.*) The

CFTC maintained that Heffernan had done little or no actual trading using the Accutrader Technique. (SMF ¶ 8(2).) [12]

c. A claim that trading profits based on the use of the Accutrader Technique were $12,570 per contract. The CFTC alleged that Heffernan had no actual trading history to support the claim. (*Id.* ¶ 8(3).)

The CFTC's cease-and-desist order instructed Heffernan to refrain from posting these and any other misrepresentations on the Accutrader Web site.[13] (Pl.'s Ex. C.) The order specifically found that Heffernan had (1) violated 7 U.S.C. § 6b(a)(i) & (a)(iii) by making material misrepresentations in connection with futures transactions, (2) violated 7 U.S.C. § 6o (1)(A) & (B) by employing a scheme to defraud a client and engaging in a practice or course of business that operated as a fraud upon a client, while acting as a Commodity Trade Advisor ("CTA"), and (3) violated 17 C.F.R. § 4.41(a) (2000), by advertising in a manner that employed a device, scheme, or artifice to defraud clients or prospective clients, or involved a transaction, practice, or course of business that operated as a fraud upon a client or prospective client, while acting as a CTA. In its Order, the CFTC sought to strike information it found misleading and demanded that Heffernan comply with certain instructions. (Pl.'s Ex. C at 7–8.) Shortly before the issuance of the CFTC's cease-and-desist order, the CFTC contends "Heffernan

---

**12.** Heffernan agrees that he did not make personal trades on the vast majority of trading opportunities, though he asserts that "[t]heir accuracy was established by real time observations of market conditions and trading opportunities...." (Doc. No. 33 ¶ 8(2).)

**13.** The CFTC's order explained that Heffernan did not admit or deny the findings within the Order. (Pl.'s Ex. C at 5.) However, the

order also asserted that "[b]y neither admitting nor denying the findings of fact or conclusions of law, Heffernan agrees that neither he nor any of his agents or employees ... shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in the Order, or creating, or tending to create, the impression that the Order is without factual basis...." (*Id.* at 8.)

took down his web site, and gave the appearance of being in compliance with the Order, as well as the Act and Regulations." (Doc. No. 1 ¶ 18.)

## C. Alleged Violations Following the September 6, 2000 Order

Despite the September 6 order, the CFTC alleges that "[b]eginning no later than October 2000, [Heffernan] restored his Internet web site www.accutrader.com, which, along with his letters to customers, promotional materials and advertisements, again contained several misrepresentations and omissions." (*Id.* ¶ 19.) The CFTC alleges that Heffernan's actions violate the CEA, CFTC regulations, and the express terms of the September 6 order.

### 1. The Accutrader Web Site

At various times after September 6, 2000, the Accutrader Web site contained the following statements relating to Heffernan's trading of futures contracts:

a. "This service [the Live Trading Room] gives you the ability to look over an experienced day trader's shoulder as he trades real time...." (SMF ¶ 22(3); Pl.'s Ex. G at 1 (Accutrader Web site on October 30, 2000); at 9 (Accutrader Web site on February 20, 2001); at 24 (Accutrader Web site on March 23, 2001); at 36 (Accutrader Web site on March 28, 2001).) [14]

b. "With a pass word, you can enter this service [the Live Trading Room] and hear George Heffernan think out loud as he day trades."

(SMF ¶ 22(4); Pl.'s Ex. G, at 1 (Accutrader Web site on October 30, 2000); at 9 (Accutrader Web site on February 20, 2001); at 24 (Accutrader Web site on March 23, 2001); at 36 (Accutrader Web site on March 28, 2001).) [15]

c. "[Heffernan] will give the actual entry price, profit targets and stop losses that he will be placing electronically with his broker." (SMF ¶ 22(5); Pl.'s Ex. G at 3 (Accutrader Web site on October 30, 2000); at 11 (Acccutrader Web site on February 20, 2001); at 28 (Accutrader Web site on March 23, 2001); at 38 (Accutrader Web site on March 28, 2001).) [16]

### 2. Communications with Gregory Comstock

Heffernan sold the Accutrader Technique, the Accutrader Day Trading School, and a subscription to the Live Trading Room to a customer, Gregory Comstock ("Comstock"), in November 2000. (SMF ¶ 84.) In a November 24, 2000 letter, Heffernan wrote to Comstock stating that a particular trade was "90% accurate approximately 1 trade per day" (Pl.'s Ex. L at 1), "80% to 85% accurate approximately 8 trades per day" (*id.* at 2), and "60% to 70% accurate approximately 12 trades per day ..." (*id.; see also* SMF ¶ 46). The letter did not contain any type of disclaimer. (SMF ¶ 47.) The CFTC asserts that Heffernan's exclusive basis for the per-

---

14. Heffernan stated that he eventually changed the representation to the following: "This service gives you the ability to look over an [sic] day trader's shoulder as he analyzes the market and/or trades real time." (Heffernan Depo. (May 8, 2001) at 89–90.)

15. Heffernan eventually altered the statement as follows: "With a pass word, you can enter this service and hear George Heffernan think out loud and see the trade on your own computer." (Pl.'s Ex. U at 3.)

16. Heffernan changed the sentence as follows: "[Heffernan] will give the actual entry price, profit targets and stop losses that he would place electronically with his broker." (Pl.'s Ex. U at 7.)

centage-accuracy figures was his Live Trading Room log. (*Id.* ¶ 48.)

After reviewing this letter, Comstock informed Heffernan that some of his representations regarding the Accutrader Technique and Live Trading Room were "misleading," and he requested a refund. (Pl.'s Ex. P; SMF ¶ 85.) A dispute then erupted over the refund of the fees Comstock had paid. (Pl.'s Ex. P; SMF ¶ 86.)

During the course of the dispute, Heffernan sent an email to Comstock on January 18, 2001 stating that his "services have been reviewed by the CFTC and [his] local attorney." (Pl.'s Ex. Q.) Comstock responded on January 23, 2001 with an email that countered as follows: "I did a little checking today and I found out that you are not registered by the CFTC, nor have your services been reviewed by the CFTC. This is a contradiction as to what you claim in your last E-mail." [17] (Pl.'s Ex. R.)

In response to Comstock's request for a refund, Heffernan retorted that he had taught Comstock "a trade that is 100 percent accurate and that alone would have been worth the price of the entire package." (Pl.'s Ex. M (email of February 13, 2001) at 1; SMF ¶ 49.) Heffernan further claimed the following: "I have a file 5 inches thick with correspondence from the CFTC, my attorney and myself. The CFTC did check out all web sites that offer trading techniques, methods or schools for futures trading." (Pl.'s Ex. M (email of February 13, 2001) at 1; SMF ¶ 89.) Heffernan's email did not contain any type of disclaimer. (Pl.'s Ex. M; SMF ¶ 50.)

### 3. *May 8, 2001 Promotional Email*

On May 8, 2001, Heffernan distributed a promotional email to various customers. (Pl.'s Ex. F; SMF ¶ 51.) Heffernan dispersed the following information:

a. "Since starting the opening trade there have been 143 winning trades and only 15 losses." (Pl.'s Ex. F at 2.) He further wrote that he had made "45 winning trades in a row on the opening trade." (*Id.*)

b. "The trend trade and other bonus trades have had 55 winners and 4 losses." (*Id.* at 2.)

c. The aggregate results of the Live Trading Room were "372 winning trades and 31 losing trades...." (*Id.*)

d. "It is possible to earn $500.00 per day or $10,000 per month for part time work of a couple of hours a day." (*Id.* at 3.)

e. "I have never had a losing day in the Live Trading Room on the Accutrader Trades." (*Id.* at 1.)

f. "The results [of his trading] are documented and recorded and can be proven with time and sales data." (*Id.* at 1.)

g. "I am trading e-minis instead of the big S & P because I get better fills in the e-mini with the electronic trading." (*Id.* at 1.)

Heffernan's May 8 email did contain a disclaimer, but it was placed approximately five printed pages after the trading results were given and after numerous customer letters were reproduced. (Pl.'s Ex. F at 8; SMF ¶ 61.) The May 8 email did not, however, contain the disclaimer provided in the CFTC's September 6, 2000 order. (Pl.'s Ex. C at 7.)

---

**17.** Comstock's January 23, 2001 email has handwriting on it that says the following: "George, I am sending you this fax. I e-mailed this to you but had a message that it may not have been sent. Thanks[,] Greg Comstock." (Pl.'s Ex. R.) Thus, it appears that Comstock also faxed the text of the email.

### 4. Publication Advertisements

To promote the sale of the products and services on the Accutrader Web site, Heffernan ran advertisements in various publications, including the *Investor's Business Daily* and *Futures* magazine. (SMF ¶¶ 63–83.) Heffernan ran at least ten advertisements in both publications.

### a. *Investor's Business Daily*

Heffernan published advertisements in various editions of the 2000 and 2001 editions of the *Investor's Business Daily*. The advertisements were similar and read as follows:

(1) **Advertisements of November 20, 2000 and December 4, 2000:** "120 Winning Trades, 9 Losing Trades, Last 90 Trading Days. Want Results Like These?" (SMF ¶¶ 63 & 64.)

(2) **Advertisements of January 29, February 20, March 5, and March 19 of 2001:** "167 Winning Trades, 12 Losing Trades, Last 119 Trading Days." (Pl.'s Ex. N §§ III.A.20, III.A.21, III.A.22; SMF ¶¶ 65–68.)

(3) **Advertisements of April 30, June 11, and June 25 of 2001:** "194 Winning Trades, 15 Losing Trades, Last 156 Trading Days." (Pl.'s Ex. N §§ III.A.15, III.A.16, III.A.24; SMF ¶¶ 69–71.)

(4) **Advertisement of August 27, 2000:** "372 Winning Trades, 31 Losing Trades, Last 12 Months Results." (Pl.'s Ex. D § III.E(d); SMF ¶ 72.)

None of the advertisements contained any type of disclaimer. (SMF ¶¶ 63–72.) Heffernan, however, contends that the Accutrader Web site, referenced in the advertisements, contained a disclaimer. (Doc. No. 33 ¶¶ 63–72.)

### b. *Futures* Magazine

Heffernan also published monthly advertisements in *Futures* magazine, beginning in December 2000 and continuing through September 2001.

The December 2000 edition and the January, February, and March editions of 2001 read as follows: "120 Winning Trades, 9 Losing Trades, Last 90 Trading Days. Do You Want Results Like These?" (Pl.'s Ex. O at 1–4; SMF ¶¶ 73–76.) None of these advertisements contained a disclaimer, though Heffernan explains that the Accutrader Web site, to which the advertisements referred, did contain a disclaimer. (Doc. No. 33 ¶¶ 73–83.)

In April 2001, Heffernan ran the following advertisement: "170 Winning Trades, 9 Losing Trades, Last 130 Trading Days. Do You Want Results Like These?" (Pl.'s Ex. O at 5; SMF ¶ 77.) The same advertisement also ran in May, June, and July of 2001. (Pl.'s Ex. O at 6–8; SMF ¶¶ 78–80.) In August 2001, the advertisement was revised to read as follows: "372 Winning Trades, 31 Losing Trades, Last 12 Months Results. Do You Want Results Like These?" (Pl.'s Ex. O at 9; SMF ¶ 81.) This advertisement also ran in the months of September through December of 2001. (Pl.'s Ex. O at 10–13.) None of these advertisements contained a disclaimer, though the Accutrader Web site did. (Pl.'s Ex. O at 1–13.)

### 5. Operation of the "Logitech Web Site"

From May 2000 through October 2001, Heffernan operated another Web site located at www.logitech.com ("the Logitech Web site") under the name "Logitech Trading." (Pl.'s Ex. S at 5–6 (indicating payments made by Heffernan for the Logitech Web site from May through October).) The Logitech Web site offered three products or services for sale to the public: (1) a commodity futures day trading technique called the "Logitech Day Trading Technique"; (2) a commodity fu-

tures day trading instructional course under the name "Logitech Day Trading School"; and (3) a "real time" trading advice service known as "Logitech Live Real Time Day Trading." (Pl.'s Ex. T at 1; SMF ¶ 91.) These services and products are identical to those on the Accutrader Web site. (SMF ¶ 91.) Heffernan did not make any changes to the Logitech Web site following the CFTC's September 6, 2000 order. (Pl.'s Ex. T; SMF ¶ 93.)

### D. Heffernan's "Paper Trading"

Heffernan often did not place orders with a broker for the trades he recommended or identified in the Live Trading Room. (Heffernan Depo. (May 8, 2001) at 61.) Rather, he computed the number of winning Accutrader trades utilizing the results of "paper trades"[18] identified in the Live Trading Room using real-time[19] data and data from orders placed with a broker:

> **MR. DOWD:** In the most simplistic form, I guess my question is: You say nine out of ten trades are winners with the Accutrader system. And when you say nine out of ten are winners, that is based upon both trades that are actually placed with a broker and trades that are paper trade[s], correct?
>
> **THE WITNESS:** That is correct. . . .

(*Id.* at 64.) Similarly, a trade is labeled as "accurate" based upon its paper-trade performance in the Live Trading Room:

> **Q:** [I]t seems to me that sometimes you will talk about one of these specific trades as [a] 100–percent accurate trade. Like you say to somebody, oh, I have this 100–percent accurate trade, here it is. When would you label it a 100–percent accurate trade?

> **A:** I labeled it [a] 100–percent accurate trade after I paper traded it in the trading room for about a month without any losses and then I said this is 100–percent accurate based on 30 days. Then when we got to two months, I'll say it's 100–percent accurate based on 60. We're now at a year, it's 100–percent accurate based on 12 months.

(Heffernan Depo. (June 13, 2001) at 187–88.) In determining whether a particular trade makes a profit, Heffernan reviews the real-time data and makes an entry in the Live Trading Room log, often not placing an order with a broker:

> **MR. DOWD:** In terms of calculating a winner or a loser and how much you made or lost, how would you grab a specific number? In other words, now you're saying maybe you have a two-point profit or maybe it's 0.75 points. But when you're putting the actual number down on your trading log, where does that number come from?

> **THE WITNESS:** It's one that I calculate. The normal profit goal is two points. If there's room for a two-point profit, then the profit target would be if we bought at—what was the number we used?

> **MS. CAPELL:** 102.25

> **THE WITNESS:** 102.25, then profit would be 104.25. Actually, I'd round down to 104.

> **MR. DOWD:** How do you know when you've met that goal?

> **THE WITNESS:** When the market trade's at it or is above it, breaks through it.

---

**18.** Heffernan defines a "paper trade" as follows: "A paper trade is just one that we didn't risk real money on. That's my definition of a paper trade. . . ." (Heffernan Depo. (June 13, 2001) at 303.)

**19.** The term "real-time data," as used by the Court within this Order, is information that is transmitted electronically to a recipient as it becomes available.

**MR. DOWD:** [W]hen you heard 104.25, you would put down a two-point profit.

**THE WITNESS:** Correct.

(*Id.* at 204–05.) In determining whether a paper trade would have been filled had it been placed with a broker, Heffernan relies on the real-time data:

**MR. DOWD:** When you paper trade, you assume you get filled, correct?

**THE WITNESS:** No, I don't assume. If I'm paper trading, I'll know if I'm filled or not if it trades through the number.

**Q:** (By Ms. Capell) Let's stop there. This is where I'm getting confused. You're in the trading room. You're not making a trade with your broker. You want a limit order for your 102.25. How do you know you're going to get that filled? If it hits 102.25?

**A:** If it hits 102.25, you may or may not be filled. It's first come, first serve. If you're No. 1 there at the number, yeah, you'll be filled.

**Q:** How do you know you got filled so that you can write it in on the log?

**A:** If you're trading, it will come right back on your electronic trading form.

**Q:** Right. But if you're not trading it.

**A:** If you're not trading, you won't know, and I would not record that unless it broke through that number. If it broke through the number … you would definitely be filled.

(*Id.* at 216–17.)

When Heffernan identifies or recommends a trade in the Live Trading Room, the listening subscribers do not know whether he places the trade with a broker.

(Heffernan Depo. (May 8, 2001) at 66–67.) Despite only placing a limited number of trades with a broker, Heffernan considered himself a "day trader" because he "paper traded" using real-time data. (*Id.* at 109.)

The only records Heffernan maintained of the trades he recommended or identified in his Live Trading Room are hand written logs. (Heffernan Depo. (March 11, 2002) at 31 & 39; SMF ¶ 23.) Heffernan identified or recommended 269 round-turn[20] trades in his Live Trading Room from March 20, 2000 through November 24, 2000, and 493 round-turn trades in his Live Trading Room from March 20, 2000 through September 11, 2001. (SMF ¶¶ 25 & 26.) Of these 493 round-turn trades, Heffernan took a market position[21] in only 13 of them. (Pl.'s Ex. H ¶ 5; Pl.'s Ex. I; SMF ¶ 27.) Heffernan did not take a market position on any identified or recommended trading opportunity from November 3, 2000 through September 11, 2001. (SMF ¶ 28 (citing Pl.'s Ex N ¶ 5; Pl.'s Ex. I; Heffernan Depo. (March 12, 2002) at 197–228).)

## II. *REQUIREMENTS FOR SUMMARY JUDGMENT*

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

---

**20.** A "Round Turn" is defined as "[a] completed transaction involving both a purchase and a liquidating sale, or a sale followed by a covering purchase." *The CFTC Glossary: A Layman's Guide to the Language of the Futures Industry,* available at http://www.cftc.gov/opa/brochures/opaglossary.htm.

**21.** The CFTC states that "[a] trade in which no market position is taken, i.e. where no money is involved, is a hypothetical or simulated trade." (Doc. No. 38 at 4 n. 3.) Thus, a trade in which a "market position" is taken is one in which money is involved. The Court uses the term "market position" to indicate that money was involved in a transaction.

202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor...." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the nonmoving party." *Four Parcels,* 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus,* 120 F.3d 248, 254 (11th Cir.1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark,* 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick,* 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The clerk has given the non-moving party notice (Doc. No. 25) of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822, 825 (11th Cir.1985)

(per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are ready for consideration.

## III. ANALYSIS

### A. Count 1: Violation of 7 U.S.C.A. § 6o (1)[22] and 17 C.F.R. § 4.41(a)

#### 1. *Applicable Law*

##### a. *7 U.S.C.A. § 6o(1)*

▇▇▇ The CEA "is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1329 (11th Cir.2002). The purpose of the CEA is served through several antifraud provisions, including 7 U.S.C.A. § 6o(1) (West 1999). *See CFTC v. Field*, 249 F.3d 592, 593 (7th Cir.2001). The CFTC claims that Heffernan violated 7 U.S.C.A. § 6o (1). (Doc. No. 1 ¶ 38.) Title 7, section 6o (1) states the following:

> It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
>
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C.A. § 6o (1). The Eleventh Circuit has determined that although subsection (A) of this statute contains a scienter requirement, subsection (B) does not. *Messer v. E.F. Hutton*, 833 F.2d 909, 919 (11th Cir.1987), *amended in part*, 847 F.2d 673 (11th Cir.1988). However, subsection (B) requires that the CFTC demonstrate that the "transaction, practice, or course of business" had an effect on a client, participant, or prospective client or participant. *See Messer*, 833 F.2d at 919 (stating that the "operates as" language of § 6o (1)(B) focuses "the force of the prohibition [in the statute] on *the effect* of the action rather than on the actor's state of mind ...") (emphasis added); *see also Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 993 (7th Cir.2000)(citing the Eleventh Circuit's *Messer* opinion and stating that § 6o (1)(B) "*focuses upon the effect* a CTA's conduct has on its investing customers rather [than] the CTA's culpability ..."); *id.* at 993–94 (stating that § 6o (1)(B) is of limited scope). Stated differently, § 6o (1) allows the CFTC to demonstrate either (1) a CTA acted with *scienter* to defraud a customer or potential customer without demonstrating an effect on a victim, § 6o (1)(A), or (2) that a CTA, though not acting with scienter, nonetheless engaged in a transaction, practice, or course of business that had the *effect* of a fraud upon a customer or potential customer, § 6o (1)(B).

▇▇ The CFTC contends that demonstrating that a customer *relied* on a misrepresentation of Heffernan is unnecessary under either subsection (A) or (B) of § 6o (1). (Doc. No. 22 at 18.) Although the Eleventh Circuit has not directly addressed whether the CFTC must show that an investor relied on a misrepresentation to demonstrate a violation of 7

---

**22.** The CFTC states that the conduct described in paragraphs 21–28 of the complaint violates 7 U.S.C.A. § 6o (1) (West 1999). (Doc. No. 1 ¶ 38.) The CFTC further states that the same conduct (¶¶ 21–28) also violates 17 C.F.R. § 4.41(a). (*Id.* ¶ 39.)

U.S.C.A. § 6o (1), various courts have utilized decisions involving § 17(a) of the Securities Exchange Act of 1933 to interpret § 6o (1). *See Messer*, 833 F.2d at 919 (utilizing § 17(a) to interpret § 6o (1)); *see also Commodity Trend Serv.*, 233 F.3d at 993 n. 6 (citing *Messer* and relying on § 17(a) decisional law to interpret § 6o (1)).

The Fifth Circuit has stated that "[s]pecific reliance by [an] investor need not be shown in a prosecution under 15 U.S.C.A. § 77q(a) [§ 17(a) ]." *United States v. Ashdown*, 509 F.2d 793, 799 (5th Cir.1975).[23] The *Ashdown* opinion was recently cited by the United States Court of Appeals for the First Circuit in *SEC v. Fife*, 311 F.3d 1 (1st Cir.2002). In *Fife*, the SEC filed a civil action seeking disgorgement of "ill-gotten gains" and imposition of a *civil monetary penalty* due to violations of, among other sections, § 17(a). *Fife*, 311 F.3d at 7. The court stated that "[u]nder section 17(a) of the Securities Act, 'specific reliance by [an] investor need not be shown.'" *Id.* at 9 (quoting *Ashdown*, 509 F.2d at 799). In essence, *Fife* extended the result in *Ashdown* from criminal cases brought by the United States to civil cases initiated by the SEC. *See also Kramas v. Sec. Gas & Oil Inc.*, 672 F.2d 766, 770 (9th Cir.1982) (stating that "[p]rosecutions and enforcement actions involve[ ] interests and procedures different from those involved in private damage suits" and thus "[t]he Government is not required to prove that anyone was defrauded or that any investor sustained loss ....") (internal quotation marks and citation omitted).

Current decisional law suggests that § 17(a) does not have a reliance requirement when an action is initiated by the Government. Thus, this Court concludes that § 6o (1)(A) does not require the CFTC to demonstrate reliance by a particular investor.[24]

### b. *17 C.F.R. § 4.41(a)*

The CFTC also asserts that Heffernan violated CFTC Regulation 4.41(a). (Doc. No. 1 ¶ 39.)

Section 4.41(a) provides as follows:

(a) No commodity pool operator, commodity trading advisor, or any principal thereof, may *advertise* in a manner which:

(1) Employs any device, scheme or artifice to defraud any participant or client or prospective participant or client; or

(2) Involves any transaction, practice or course of business which operates as a fraud or deceit upon any participant or client or any prospective participant or client.

---

**23.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

**24.** The Eleventh Circuit has recently stated that "[u]nlike a cause of action for fraud under the common law of torts, 'reliance' on the representations is not a requisite element in an enforcement action." *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 n. 6 (11th Cir.2002). Demonstrating that a transaction, practice, or course of business had the "effect" of a fraud under § 6o (1)(B) would appear most easily shown (if not always shown) by demonstrating that a customer relied on a particular misrepresentation or omission. Thus, there appears to be some potential tension between the notion that the CFTC need not demonstrate reliance in an enforcement action and the notion that liability under § 6o (1)(B) exists when the CFTC has demonstrated that a CTA engaged in a transaction, practice, or course of business, that had the "effect" of a fraud. However, to the extent this Court determines that Heffernan violated § 6o (1)(A), it need not address § 6o (1)(B).

17 C.F.R. § 4.41(a) (2002) (emphasis added). The language of § 4.41(a)(1)-(2) closely resembles that of subsections (A) and (B) of 7 U.S.C.A. § 6o (1). Thus, § 4.41(a)(1), like § 6o (1)(A), contains a scienter requirement, while subsection (a)(2), like § 6o (1)(B), does not. *See Commodity Trend Serv.*, 233 F.3d at 993–94 (stating that Regulation 4.41(a)(1) contains a scienter requirement while subsection (a)(2) does not); *In re CTS Financial Publishing, Inc.*, No. 00–34, 2001 WL 747746, at *6 (CFTC July 5, 2001) ("While Section 4o (1)(A) of the Act and Regulation 4.41(a)(1) require proof of scienter, Section 4o (1)(B) and Regulation 4.41(a)(2) do not.").[25] Also, because § 4.41(a)(2) contains the "operates as" phraseology found in 7 U.S.C.A. § 6o (1)(B), the CFTC must demonstrate an "effect" from the advertising to prove a violation of subsection (a)(2).

#### c. *Misrepresentation, Materiality, and Scienter*

■ To be liable under § 6o (1), Heffernan must make a material misrepresentation or omit material information; to be liable under § 6o (1)(A), he must do so with scienter. To determine whether an individual has made a material misrepresentation sufficient to support liability under § 6o (1), the Court of Appeals has stated the following: "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *R.J. Fitzgerald*, 310 F.3d at 1328 (quoting *Hammond v. Smith Barney Harris Upham & Co.*, [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617, 36,-657 & n. 12 (CFTC Mar. 1, 1990)). A "misrepresentation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *Id.* at 1328–29 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)).

■ Finally, scienter is established if a defendant's conduct was "intended to defraud, manipulate, or deceive" or if a defendant's conduct "represents an extreme departure from the standards of ordinary care." *Id.* at 1328. In addition, conduct involving "highly unreasonable omissions or misrepresentations ... that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it" demonstrates scienter. *Id.* (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001)) (internal quotation marks omitted).

#### 2. *Allegations*

#### a. *Misrepresentations that Heffernan Placed Orders With a Broker: the Web Sites*

■ The CFTC alleges that "Heffernan's statements on his Accutrader and Logitech Trading web sites falsely suggested that he took a market position in all of the trades he recommended in the Live Trading Room, when, in fact, he did not." (Doc. No. 1 ¶ 21.) Specifically, the CFTC alleges the following statements inaccurately suggested that Heffernan took a market position: (1) "With a password, you can enter this service and hear George

---

25. This CFTC order was issued with the consent of the parties and in settlement of the dispute. In *Steadman v. SEC*, 603 F.2d 1126 (5th Cir.1979), law binding on this Court stated that "the Commission's construction of the securities laws *in settled cases* as well as litigated ones *is entitled to great weight.*" *Steadman*, 603 F.2d at 1136 n. 15 (emphasis added). The petitioner had attacked the SEC's use of an order that was issued in connection with an offer of settlement. *Id.* Because there is no principled reason to distinguish between SEC consent orders and those issued by the CFTC, CFTC consent orders will receive the same treatment.

Heffernan think out loud as he day trades."; (2) "This service gives you the ability to look over an experienced day trader's shoulder as he trades real time."; (3) "[Heffernan] will give the actual entry price, profit targets and stop losses that he will be placing electronically with his broker."; and (4) "George will trade until he is up one or two winning trades and then quit for the day. If he is in a losing position at 11:30, then he will continue to trade until he is back even and then quit for the day." (Doc. No. 1 ¶ 21; Pl.'s Ex. G.)

Heffernan concedes that he is a CTA (Doc. No. 32 at 14), and the parties do not dispute that the Internet is an instrumentality of interstate commerce. Furthermore, Heffernan does not deny that he made the statements on his Accutrader and Logitech Web sites.

The undisputed facts show that Heffernan did not take a market position in the vast majority of the "trades" he recommended or identified, and thus he was often not risking his own money using his trading system.[26] Yet, the overall message of Heffernan's statements leaves precisely the opposite impression. Whether a purveyor of a trading system actually risks money using his own trading system is a fact that a reasonable investor or customer would want to know before purchasing the product. *See R & W Technical Servs. v. CFTC*, 205 F.3d 165, 170 (5th Cir.2000) ("A claim that one trades pursuant to the system one sells clearly expresses a higher level of confidence than merely putting a

corporate logo on the product and offering a full refund."). Investors may, understandably, base a decision to utilize a particular trading system on the developer's own use of it. *See In re Gramalegui*, No. 01–16, 2001 WL 777038, at *1–*2 (CFTC July 12, 2001) (stating that a purveyor's false suggestion that his mother utilized his trading system when she did not was fraudulent). Thus, when a purveyor of a system claims that he trades using his own system when he does not, he is making a material misrepresentation.

 Heffernan's statements were made with scienter. It is highly unreasonable and a severe departure from the ordinary standard of care for a seller to represent that he risks his own capital using his trading system when he knows otherwise. Heffernan's blatant misrepresentations present a clear risk of misleading customers and lead to the conclusion that his conduct was intentionally deceptive. As a result, Heffernan employed a device, scheme, or artifice to defraud a client or prospective client in violation of § 6o (1)(A).

 The statements on Heffernan's Web site are not only a violation of § 6o (1)(A), they also violate Regulation 4.41(a)(1), which prohibits any advertisement that "employ[s] any device, scheme, or artifice to defraud any client or prospective client." 17 C.F.R. § 4.41(a)(1). Because the messages on Heffernan's Web site (1) operated as advertisements promoting Heffernan's Accutrader Technique

---

**26.** Heffernan maintained only hand written logs of the trades he recommended or identified in the Live Trading Room. (SMF ¶ 23.) Heffernan identified or recommended 493 round-turn trades in his Live Trading Room from March 20, 2000 through September 11, 2001. (SMF ¶ 25 (citing Pl.'s Ex. H ¶ 5); Doc. No. 33 ¶ 25 (admitting the number of trades).) Of the 493 round-turn trades identified or recommended from March 20, 2000 to

September 11, 2001, Heffernan took a market position in only 13 of them. (SMF ¶ 27 (citing Pl.'s Ex. H ¶ 5); Doc. No. 33 ¶ 27 (admitting the number of trades in which he took a market position).) Of the 13 round-turn transactions in which Heffernan took a market position, he recorded prices for only six of them. (SMF ¶ 29 (citing Pl.'s Ex. H ¶ 5); Doc. No. 33 ¶ 29.)

and (2) distributed the message to potential investors that he traded using his own trading system, the statements were in violation of § 4.41(a)(1).

### b. Misrepresentations About Accuracy and Profitability

(i) *Representations of "Winning Trades" and Profitability*

■ The CFTC alleges that Heffernan made false assertions concerning the profitability and the number of winning trades produced by the Accutrader Technique. First, the CFTC maintains that Heffernan advertised false statements related to his purported trading results in the *Investor's Business Daily* and *Futures* Magazine. (Doc. No. 1 ¶ 27.) The CFTC asserts that Heffernan's business records do not support the purported profitability or accuracy of his trades. (*Id.* ¶ 28.)

Second, the CFTC claims that in an email letter dated May 8, 2001, Heffernan made the following assertions:

1. "I have never had a losing day in the live trading room on the Accutrader trades."
2. "The results are documented and recorded and can be proven with time & sales data."
3. "The total including all of the above trades taken in the trading room is also doing very good. The trading room has had 372 winning trades and 31 losing trades since I started the trading room."
4. "In other words it is possible to earn $500 per day or $10,000 per month for part time work of a couple hours a day."

(*Id.* ¶ 26.) As a result of the statements, the CFTC alleges that both the advertisements and the May 8 letter violate § 6o (1) and Regulation 4.41(a).

Heffernan's trading has not produced profitable results. Heffernan admits that his personal trading resulted in over $20,000 of losses. (Doc. No. 33 ¶ 39.) Furthermore, over any four-month period or longer, Heffernan's futures trading in any commodity futures trading account failed to produce a net profit. (*Id.* ¶ 43.) Indeed, Heffernan's operation of the Peregrin Financial Group account and the Lind Waldock & Company account resulted in net losses of $17,432 and $4,027.46, respectively. (*Id.* ¶¶ 35 & 38.) Heffernan has produced no evidence to support his assertion that he has completely avoided suffering a loss in the Live Trading Room, though he does admit to large personal trading losses. (*Id.* ¶ 39.) Further, Heffernan has produced no record or log demonstrating that he ever earned $500 a day or $10,000 per month using the Accutrader System; rather, he bases his assertions on mere speculation. (Heffernan Depo. (June 13, 2001) at 283–85.)

Heffernan claims that some of his losses are attributable to research costs. (Doc. No. 33 ¶¶ 33, 35, 38, & 43.) Nonetheless, Heffernan's statements are misleading because he has no basis for his claims that he traded profitably.

■ Similarly, Heffernan's statements in his advertisements and the May 8 letter concerning the number of winning trades produced by the Accutrader Technique are misleading. Heffernan admits that he calculated the number of winning trades in the advertisements and letter based on the Live Trading Room log. (SMF ¶ 83.) However, the Live Trading Room log contained primarily hypothetical results. Heffernan took a market position in no more than 13 trades listed in the Live Trading Room log. (Doc. No. 33 ¶ 27.) Thus, the advertisements in *Futures* Magazine and *Investor's Business Daily* indicating that Heffernan had produced dozens of "winning trades" with the Accutrader System are not based on

trades actually placed with a broker. (*See* Doc. No. 33.) Asserting a trading system has achieved a specific number of "winning trades" is, in essence, indicating the profitability of a trading system; indeed, were this not the intent behind the publication of the statistics, there would be little reason to advertise them. Heffernan's (1) statements concerning the profitability of the Accutrader Technique and (2) his omission of the information that his "winning trades" were based in large part on hypothetical results are misrepresentations. *See CFTC v. Skorupskas*, 605 F.Supp. 923, 933 (E.D.Mich.1985) ("Courts have recognized that the failure to disclose information that a performance record does not represent the results of *actual trading but of hypothetical or fictitious trading* is a violation of section 4o (1).") (emphasis added); *In re Radcliffe*, No. 02–04, 2002 WL 1271803 (CFTC June 10, 2002). Furthermore, statements of profitability are indisputably material. *See CFTC v. Noble Wealth Data*, 90 F.Supp.2d 676, 686 (D.Md.2000) ("[M]isrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law."), *aff'd in part and vacated in part*, 278 F.3d 319 (4th Cir.2002).

Heffernan's omission of information warning customers that his trading results were based on hypothetical results was highly unreasonable and represented a gross departure from the ordinary standard of care, as did his statements of profitability. Thus, Heffernan's statements were made with scienter. As a result, Heffernan violated § 6o (1)(A).

Finally, because both the May 8, 2001 email and the information in *Futures* Magazine and *Investor's Business Daily* were advertisements by which Heffernan employed a device, scheme, or artifice to defraud a client or prospective client, Heffernan also violated 17 C.F.R. § 4.41(a)(1).

(ii) *"Percentage" Accuracy*

▇▇ The CFTC states that "Heffernan claimed that the [Accutrader] Technique yielded profitable trades a high percentage of the time." (Doc. No. 1 ¶ 24.) Specifically, the CFTC asserts that Heffernan stated in a customer letter of November 24, 2000 that certain trades were

1. "90% accurate approximately 1 trade per day."
2. "80% to 85% accurate approximately 8 trades per day."
3. "60% to 70% accurate approximately 12 trades per day."
4. "60% to 70% accurate approximately 1 trade per day."

(*Id.* ¶ 24.) Because the CFTC alleges that Heffernan cannot support his claims, it asserts he violated § 6o (1). Heffernan counters that his trading results and advertising statements are accurate because he documented his trades on paper using real-time data. (Doc. No. 32 at 12–13.)

Heffernan did not determine a trade to be of a certain accuracy by recording the results of orders placed with a broker. Rather, Heffernan utilized the results of "paper trades" to determine a particular trade's accuracy. (Heffernan Depo. (June 13, 2001) at 187–88, 259.) The "paper" or "fictitious" trading Heffernan used to determine the accuracy of a trade is potentially misleading because investors could reasonably believe the accuracy of Heffernan's percentage figures to be based on trades actually placed with a broker. *See Skorupskas*, 605 F.Supp. at 933.

The overall message of Heffernan's statements indicated that he was taking a market position using his trades, and the common understanding of Heffernan's statements would lead an investor to believe that Heffernan's accuracy determination were based on trades placed with a broker. Thus, Heffernan's omission of the

relevant information that his trading accuracy was based on hypothetical trading makes his figures misleading. In addition, Heffernan's failure to disclose that the trading accuracy was based on hypothetical or fictitious trading is material. Finally, the omission of the relevant information was done with scienter because it was obvious, and Heffernan must have known, that the missing information was likely to cause an investor to be misled. As a result, Heffernan violated § 6*o* (1)(A) by employing a device, scheme, or artifice to defraud a client or prospective client.

The "percentage" trades were distributed in a November 24, 2000 promotional email to Gregory Comstock. The November 24 email was an advertisement and, as a result, it violated Regulation 4.41(a)(1).

### (iii) *Letter to Comstock*

The CFTC maintains that in a letter dated February 13, 2001, Heffernan falsely promoted the profitability and accuracy of his system. In that email, Heffernan stated: "I even taught you a trade that is 100 percent accurate . . . ." (Pl.'s Ex. M at 1.)

Heffernan wrote the February 13 email to Gregory Comstock during the course of a dispute. (*See id.*) The text preceding Heffernan's assertion provides the context of the statement:

Dear Gregg,

Obviously you do not remember what you stated on the phone machine tape. You are taking things out of context and misinterpreting [sic]. The technique is mechanical and that is a true statement. You can get very good results trading it blindly. In the trading room I only take trades that I believe are 90% accurate or better. I get the higher accuracy by appling [sic] the additional trading skills which recently also includes listening to the live pit commentary. I am not going to waste my time on the rest of your letter which is based on misinterpretation and taking things out of context. Greg, I never would have thought I would be receiving these type of phone calls and e-mails and faxes from you. *I even taught you a trade that is 100 percent accurate and that alone would have been worth the price of the entire package.*

(*Id.* at 1 (emphasis added).)

The Court must consider the context of Heffernan's statement. The February 13 email was a personal letter to Comstock responding to a communication from him. Heffernan was not promoting the Accutrader Technique, but was, more accurately, attempting to justify the fee he charged Comstock. Thus, in this instance Heffernan did not violate § 6*o* (1). Furthermore, because the February 13 letter responsive to Comstock's communication was not an advertisement, Heffernan did not thereby violate Regulation 4.41(a).

### B. Count 2: Violation of 17 C.F.R. § 4.41(b)

The CFTC alleges that some of Heffernan's statements made in a November 24, 2000 email letter should have contained a disclaimer regarding hypothetical trading results. (Doc. No. 1 ¶¶ 24 & 43.) In the letter, Heffernan asserted several times that certain trades that he had created were accurate a certain percentage of the time. (Pl.'s Ex. L at 1–2.) The CFTC also alleges that Heffernan's statement in his February 13, 2001 email to Comstock that he had "taught [him] a trade that is 100% accurate" violated Regulation 4.41(b). (*See* Pl.'s Ex. M at 1.) This statement, the CFTC contends, is a hypothetical trading result necessitating the insertion of a disclaimer. (Doc. No. 1 ¶¶ 25 & 43.) In addition, the CFTC states that a May 8, 2001 promotional email contained hypothetical trading results and did not

contain a disclaimer.[27] (Pl.'s Ex. F.) Finally, the CFTC asserts that advertisements placed in the *Investor's Business Daily* and *Futures* Magazine should have contained a disclaimer, but did not.[28] Title 17, section 4.41(b) of the Code of Federal Regulations states the following:

No person may present the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest or series of transactions in a commodity interest of a commodity pool operator, commodity trading advisor, or any principal thereof, unless such performance is accompanied by one of the following:

(i) The following statement: "Hypothetical or simulated performance results have certain inherent limitations. Unlike an actual performance record, simulated results do not represent actual trading. Also, since the trades have not actually been executed, the results may have under- or over-compensated for the impact, if any, of certain market factors, such as lack of liquidity. Simulated trading programs in general are also subject to the fact that they are designed with the benefit of hindsight. No representation is being made that any account will or is likely to achieve profits or losses similar to those shown;" or

(ii) A statement prescribed pursuant to rules promulgated by a registered futures association pursuant to section 17(j) of the Act.

17 C.F.R. § 4.41(b)(1). The regulation requires that the mandated disclaimer be prominently disclosed. *Id.* § 4.41(b)(2); *In re Armstrong*, No. 87–10, 1995 WL 108992, at *10, Comm. Fut. L. Rep. (CCH) ¶ 26,332 (CFTC Mar. 10, 1995) ("The basic purpose of Regulation 4.41(b)(1) is to alert 'prospective customers to the limitations inherent in simulated and hypothetical past performance results.' As the cautionary statement required by Regulation 4.41(b)(1) explains, when trades are not actually executed, the results may under-or-over compensate for the potential impact of certain market factors, such as lack of liquidity."). Section 4.41(b) applies to any publication, writing, advertisement, or other literature or advice. 17 C.F.R. § 4.41(c).

### 1. The November 24, 2000 Customer Email

 The November 24 email asserts that various trades are 90%, 80%, and 60%–70% accurate an estimated number of trades per day. (Pl.'s Ex. L. at 1–2.) To say that a particular trade is accurate a certain percentage of the time is to assert a performance result. If the performance result is not actually based on a transaction in the market at issue, i.e., a transaction in which the investor risks capital, then the result is hypothetical. *See In re Armstrong*, No. 87–10, 1995 WL 108992, at *10, Comm. Fut. L. Rep. (CCH) ¶ 26, 332 (CFTC Mar. 10, 1995) ("Regulation 4.41(b) does not attempt to catalogue the

---

**27.** The statements contained in the email are as follows:

1. "I have never had a losing day in the live trading room on the Accutrader trades." (Pl.'s Ex. F at 1.)
2. "The results are documented and recorded and can be proven with time and sales data." (*Id.*)
3. "The total including all of the above trades taken in the trading room is also doing very good. The trading room has had 372 winning trades and 31 losing trades since I started the trading room." (*Id.* at 2.)
4. "In other words it is possible to earn $500.00 per day or $10,000 per month for part time work of a couple of hours a day." (*Id.* at 3.)

**28.** Paragraphs 28–30 of the complaint do not contain factual allegations that might constitute a violation of 17 C.F.R. § 4.41(b).

many material distinctions between actual transactions and those that are merely 'hypothetical' or 'simulated.' The language, however, is sufficiently broad to encompass *any transaction* that is not actually executed in the market at issue.") (emphasis added).

■] The percentage-accuracy results furnished by Heffernan are based on data that was not obtained from transactions placed with a broker or in a commodities market. (*See* Heffernan Depo. (June 13, 2001) at 187–88.) Rather, Heffernan labeled a trade as accurate depending on its "paper-trade" performance. In determining whether a particular trade makes a profit, Heffernan watches the real-time data that he receives and makes an entry in the Live Trading Room log, often not placing an order with a broker. (*Id.* at 204–05.) Because Heffernan was providing hypothetical results to clients or prospective clients, he should have included a disclaimer in the email. His failure to do so constitutes a violation of 17 C.F.R. § 4.41(b).

### 2. February 13, 2001 Email

■ Heffernan wrote the February 13 email to Gregory Comstock during the course of a dispute that encompassed several emails. (Pl.'s Ex. M.) This email contained a statement that Heffernan had taught Comstock a trade that was 100% accurate. (Pl.'s E. M at 1.) As has already been observed, Heffernan's statement in the February 13 email was made defensively in the circumstances of a fee dispute, and not in the context of an advertisement. As a result, Heffernan did not violate § 4.41(b) in the February 13 email.

### 3. May 8, 2001 Promotional Email

■ The May 8, 2001 email is eight pages long. (Pl.'s Ex. F.) The first three pages are in the form of a letter written by Heffernan explaining many of the features and results of the Accutrader Technique. (*Id.*) In the middle of the fourth page, the email reprints "references," which are letters purportedly sent from customers to Heffernan. (*Id.* at 4–8.) The references continue until the last paragraph of the email; the last paragraph is a disclaimer. (*Id.* at 8.) The disclaimer is written in a font that is slightly smaller than the text of the rest of the email. (*See* Pl.'s Ex. F at 8.) The disclaimer is not the one from Regulation 4.41(b), and does not warn consumers about the use of hypothetical trading results. (*See id.*)

The CFTC maintains that four statements in the May 8 email contain hypothetical performance results. One statement, for example, gives the number of winning and losing trades: "The total including all of the above trades taken in the trading room is also doing very good. The trading room has had 372 winning trades and 31 losing trades since I started the trading room." (*Id.* at 2.) Heffernan's statement includes a total of over 400 trades, yet Heffernan admits that from March 20, 2000 to September 11, 2001, he took a market position in only 13 of the 493 round-turn trades he identified or recommended in the Live Trading Room. (SMF ¶ 27 (citing Pl.'s Ex. H ¶ 5.)) Thus, there is no dispute that the May 8, 2001 email contained hypothetical trading results. Heffernan's failure to relay the important information about hypothetical results in the disclaimer violates Regulation 4.41(b).

Even had Heffernan included an appropriate disclaimer, its placement at the end of an eight-page email far removed from the hypothetical trading results would violate Regulation 4.41(b). *See CFTC v. Avco Financial Corp.*, 28 F.Supp.2d 104 (S.D.N.Y.1998) ("[The] warning was placed on a separate page from the rest of the materials containing the misrepresenta-

tions at issue and the warning was phrased in such a manner as to be misleading to the reasonable potential customer, causing him or her to believe that the warning did not apply to AVCO's statements regarding Recurrence's performance results. These order form warnings were not prominently disclosed as required by § 4.41(b)(2)."), *aff'd in relevant part sub nom. CFTC v. Vartuli*, 228 F.3d 94 (2d Cir.2000).

### 4. Advertisements

Heffernan has published numerous advertisements that give hypothetical trading results in both *Futures* Magazine and *Investors's Business Daily*. (*See* Pl.'s Exs. D,N,O; SMF; Doc. No. 33.) Heffernan advertised in *Investor's Business Daily* 10 times and in *Futures* Magazine 13 times. All of these advertisements followed the same form, though the actual numbers changed in the advertisements. For example, the August 27, 2000 advertisement in the *Investor's Business Daily* read as follows: "372 Winning Trades, 31 Losing Trades, Last 12 Months Results." (*See* SMF ¶¶ 63–72; Pl.'s Ex. D § III.E(d).) The August 2001 issue of *Futures* Magazine contained a similar advertisement: "372 Winning Trades, 31 Losing Trades, Last 12 Months Results. Do You Want Results Like These?" (Pl.'s Ex. O at 8; SMF ¶ 81.) Heffernan has admitted that no more than 13 of the trades that were identified or recommended in the Live Trading Room were actually executed with a broker. (SMF ¶ 27 (citing Pl.'s Ex. H ¶ 5).) Hence, Heffernan's advertisements contain hypothetical trading results.

■■■ Heffernan counters that he satisfied Regulation 4.41(b) because the Web site to which the advertisements refer contains a disclaimer. (Doc. No. 32 at 10.) Yet, § 4.41(c) states that the disclaimer requirement of § 4.41(b) applies to advertisements. 17 C.F.R. § 4.41(c). There-

fore, the regulation itself contemplates that some advertisements may contain hypothetical results and that a disclaimer should be included with the results. Furthermore, existing decisional law supports the notion that advertisements should contain a disclaimer when demanded by CFTC regulations. *See CFTC v. Vartuli*, 228 F.3d 94, 108 (2d Cir.2000) ("AVCO's failure to include the disclaimer *in its advertisements* ... violated § 4.41(b).") (emphasis added).

In addition, in an analogous situation, the CFTC has found that a disclaimer accessed by a hyperlink is not "prominently disclosed" as required by Regulation 4.41(b). *See In re Martin*, No. 87–10, 2000 WL 1262589, at *3, Comm. Fut. L. Rep. (CCH) ¶ 28, 230, (CFTC Sept. 6, 2000) ("The Web site purports to provide a disclaimer addressing the inherent limitations of performance results based on simulated or hypothetical trading. However, the disclaimer is included in a hyperlink completely separate from the hypothetical trading results and, due to the positioning of the hyperlink, a potential customer is likely to see Martin's hypothetical results without reading the disclaimer."). Accordingly, Heffernan's disclaimer is not "prominently disclosed" as required by Commission Regulation 4.41(b)(2).

Heffernan's trading results were seen by readers of the publications in which Heffernan advertised without the disclaimer also being seen. Thus, Heffernan's advertisement of one piece of information (the hypothetical results) without the other (the disclaimer) violates § 4.41(b). Moreover, Heffernan violated § 4.41(c) by not placing the disclaimer in a manner sufficient to warn investors that the results in the advertisements were hypothetical in violation of § 4.41(c).

## C. Count 3: Violation of 17 C.F.R. § 4.16[29]

The CFTC alleges that Heffernan, while acting as a CTA, sent two emails, dated January 18, 2001 and February 13, 2001, "falsely suggesting that the CFTC had endorsed [Heffernan's] web site and products." (Doc. No. 1 ¶ 31.) Title 17, section 4.16 of the Code of Federal Regulations states the following:

> It shall be unlawful for any ... commodity trading advisor ... to represent or imply in any manner whatsoever that such ... commodity trading advisor has been sponsored, recommended or approved, or that its abilities or qualifications have in any respect been passed upon, by the Commission, the Federal government or any agency thereof.

17 C.F.R. § 4.16.

The CFTC has submitted an email from Heffernan to Gregory Comstock, a client, stating that his "services have been reviewed by the CFTC and [his] local attorney." (Pl.'s Ex. Q (email of January 18, 2001).) In February, Heffernan again emailed Comstock, stating as follows: "I have a file 5 inches thick with correspondence from the CFTC, my attorney, and myself. The CFTC did check out all web sites that offer trading techniques, methods or schools for futures trading." (Pl.'s Ex. M (email of February 13, 2001).)

The CFTC asserts that it has "never endorsed Heffernan's Web site and promotional materials in any way. Indeed, the Commission staff reviewed those materials and found violations of the Act and Regulations which led to the issuance of the Commission's Order." (Doc. No. 1 ¶ 32.)

Heffernan does not contest the content of the emails or their authenticity. Rather, Heffernan argues that only one customer, Comstock, received the emails (Pl.'s Exs. M & Q) and the representations to him "did not induce Comstock" to take any particular action. (Doc. No. 32 at 17.) Heffernan also argues that "[o]ne could certainly understand how [he] would believe that his business had been reviewed by the CFTC." (*Id.*) As he explains, a "CFTC representative, Wagner, had called him about a week before the Comstock episode, telling him his Website had been reviewed and he needed to make a change by removing the term 'experienced trader,' which he did." (*Id.* (citing Heffernan Depo. (March 12, 2001) at 143).) In essence, Heffernan argues that the CFTC reviewed his Web site for violations and thereafter suggested a change and that he understood this to be a review.[30]

Regulation 4.16 is an extension of 7 U.S.C.A. § 6o (2). Under § 6o (2), it is "unlawful for any commodity trading advisor ... to represent or imply in any manner whatsoever that such person has been sponsored, recommended, or approved, or that such person's abilities or qualifications have in any respect been passed upon, by the United States or any agency or officer thereof." 7 U.S.C.A. § 6o (2). The relevant language of the statute and the regulation are substantially similar. The regulation simply extends the prohibition of § 6o (2) to the principals of CTAs and Commodity Pool Operators ("CPOs") and those who solicit on their behalf. *See* Revisions of Commodity Pool Operator and Commodity Trading Advisor Regulations; Delegation of Authority, 46 Fed.Reg. 26,0004, 26,012 (May 8, 1981) (codified at 17 C.F.R. § 4.16 (2002)). Thus, the Court will utilize the little exist-

---

**29.** The alleged violation of 17 C.F.R. § 4.16, was not addressed in the CFTC's September 6,2000 order.

**30.** The parties have cited no law interpreting 17 C.F.R. § 4.16, and the Court has found none.

ing law of § 6o (2) to inform its analysis of Regulation 4.16.

Section 6o (2) is written broadly to include both direct statements and implications by a CTA that he has been sponsored, recommended, or approved by the CFTC. *See In re First New York Commodity Options Ltd.,* No. 77–5, 1978 WL 10771, at *3 (CFTC Feb. 10, 1978) ("During the period July 1976 to January 14, 1977, Respondents represented and *implied* that First New York had been sponsored, recommended or approved or that its abilities or qualifications had been passed upon by the Commission, when such was not the case. Thus Respondents violated Section 4o (2) of the Act, 7 U.S.C. § 6o (2) ....") (emphasis added). Consistent with the regulation's broadly written language, the CFTC has read § 6o (2) expansively. *See Hamada v. Cullin,* No. 89–R81, 1990 WL 282906, at *8, Comm. Fut. L. Rep. (CCH) ¶ 24,837,(CFTC Apr. 19, 1990) (stating that the respondent's "use of his registration status to enhance his claims of integrity and to buttress his money-back guarantee constituted clear violations of Section [6o (2) ] of the Act").

Heffernan violated § 4.16 in the January 18, 2001 email. Heffernan emailed Comstock, stating that Heffernan's "services have been reviewed by the CFTC and [his] local attorney." (Pl.'s Ex. Q (email of January 18, 2001) at 1.) This statement implied that Heffernan's products had undergone an inspection by a regulatory agency, and thus that he and his products were legitimate and approved by the CFTC.

In addition, Heffernan violated § 4.16 in the February 13, 2001 email. Heffernan's email responds to a fax sent by Gregory Comstock on January 23, 2001, which stated the following: "Dear George, I know you are a busy person, but I was hoping to get a response from you today. I did a little checking today and I found out that

you are not registered by the CFTC, nor have your services been reviewed by the CFTC. This is a contradiction as to what you claim in your last E-mail." (Pl.'s Ex. R.) Heffernan, in response, wrote as follows: "Also in response to your fax. I have a file 5 inches thick with correspondence from the CFTC, my attorney and myself. The CFTC did *check out* all Web sites that offer trading techniques, methods or schools for futures trading." (Pl.'s Ex. M at 1 (emphasis added).)

Heffernan's email plainly states that his Accutrader Web site had been "checked out" by the CFTC without any disclosure of why the CFTC was reviewing it; Heffernan thereby implied that his trading system had been reviewed by the CFTC. The Eleventh Circuit, quoting the Fifth Circuit, has explained that remedial statutes (and thus their supporting regulations) are to be construed liberally to effectuate their purpose. *See CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F.3d 1321, 1329 (11th Cir.2002) ("Remedial statutes are to be construed liberally, and in an era of increasing individual participation in commodities markets, the need for protection has not lessened.") (quoting *R & W Technical Servs. v. CFTC,* 205 F.3d 165, 173 (5th Cir.2000)) (citations omitted). Thus, Heffernan's assertion that the CFTC had "checked out" his Web site in the February 13, 2001 email violated § 4.16.

## D. Count Four: Violation of the CFTC'S September 6, 2000 Order

The CFTC alleges in Count Four of the complaint that Heffernan violated its September 6, 2000 order. The CFTC specifically asserts that Heffernan violated §§ VI.1, VI.3(a)(i), VI.3(b), and VI.3(c) of the order. (Doc. No. 1 ¶¶ 51–53.)

### 1. Section VI.1

Section VI, paragraph 1 of the CFTC's September 6, 2000 order directs George

Heffernan to "cease and desist from further violations of Sections ... 6o (1)(A) and (B), and Section 4.41(a) of the Commission's Regulations...." (Pl.'s Ex. C at 6.)[31] The Court has found that Heffernan violated § 6o (1)(A) and 17 C.F.R. § 4.41(a)(1) as discussed in § III.A of this Order. The actions constituting violations of § 6o (1) and Regulation 4.41(a) in § III.A of this Order also constitute violations of § VI.1 of the CFTC's September 6 order.

### 2. Section VI.3(a)(i)

Section VI, paragraph 3(a)(i) states that "Heffernan shall not misrepresent, expressly or by implication: (i) the performance, profits or results achieved by, or the results that can be achieved by, users, including him/herself, of any commodity futures or options trading system or advisory service...." (*Id.* at 7.) The CFTC alleges that the conduct set forth in paragraphs 21 through 30 of the complaint violates Section VI.3(a)(i) of its order. (Doc. No. 1 ¶ 53.)

The Court has determined that Heffernan, through specific conduct discussed in § III.A of this Order, misrepresented the accuracy and profitability of the Accutrader system. These misrepresentations are violations of the CFTC's September 6 order.

### 3. Section VI.3(b)

Section VI.3(b) of the September 6 order directs Heffernan to undertake to do the following:

(b) Heffernan shall not present the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest or series of

transactions in a commodity interest unless such performance is accompanied by the following statement, as required by 17 C.F.R. § 4.41(b):

**Hypothetical or simulated performance results have certain inherent limitations. Unlike an actual performance record, simulated results do not represent actual trading. Also, since the trades have not actually been executed, the results may have under- or over-compensated for the impact, if any, of certain market factors, such as lack of liquidity. Simulated trading programs in general are also subject to the fact that they are designed with the benefit of hindsight. No representation is being made that any account will or is likely to achieve profits or losses similar to those shown.**

In doing so, Heffernan shall clearly identify those hypothetical or simulated performance results which were based, in whole or in part, on hypothetical trading results....

(Pl.'s Ex. C at 7.) The Court has found in § III.B of this Order that Heffernan presented hypothetical or simulated results of certain trades without including the disclaimer required by § 4.41(b). As a result, Heffernan has violated § VI.3(b) of the CFTC's September 6 order.

### 4. Section VI.3(c)

The September 6 order stated the following:

Heffernan shall not make any representation of financial benefits associated with any commodity futures or options trading system or advisory service without first disclosing, prominently and conspicuously, that futures trading involves

---

**31.** The September 6 order also directed Heffernan to cease and desist from violating 7 U.S.C.A. §§ 4b(a)(i) and (a)(iii). The CFTC, however, has not alleged in the complaint before this Court that Heffernan violated this statute, and the parties have not submitted arguments regarding it. Thus, the Court does not address any issues related to 7 U.S.C.A. § 4b(a).

high risks with the potential for substantial losses. . . .

(*Id.*) The conduct alleged to violate § VI.3(c) of the Order is set forth in paragraphs 21–30 of the complaint. (Doc. No. 1 ¶ 53.)

### a. *Accuracy Statements*

 Specifically, the CFTC alleges that in a November 24, 2000 letter, Heffernan described the accuracy of certain trades without disclosing the risks involved. (Doc. No. 1 ¶ 24.) [32] For example, Heffernan stated that he had a trade that was "90% accurate approximately 1 trade per day." (*Id.*) He made similar statements asserting that he had trades that were 80% to 85% accurate and 60% to 65% accurate. (*Id.*) By telling potential investors about the accuracy of his trades, Heffernan is promoting the financial benefits the product can bring the purchaser. Because he is promoting, by implication, the financial benefits of the Accutrader trades and the Accutrader System, Heffernan should have included the disclaimer required by § VI.3(c) in the November 24, 2000 correspondence.

### b. *The Promotional Letter*

In a promotional letter dated May 8, 2001, Heffernan made numerous statements indicating the efficacy of the Accutrader system. (Pl.'s Ex. F at 1–3; *see* Doc. No. 1 ¶ 26.) [33]

All of these statements from the May 8 email promote the Accutrader system. Indeed, the statements advocate the financial benefits an individual might receive from purchasing the Accutrader system. Heffernan's declaration of the number of winning and losing trades is intended to promote the effectiveness of the product so that investors will purchase it. Likewise, Heffernan's declarations of profitability directly promote the financial benefits of the product. Because Heffernan is promoting the financial benefits of the Accutrader trades and the Accutrader system, Heffernan should have included the disclaimer required by § VI.3(c) of the CFTC order.

### c. *Publication Advertisements*

The Court has already determined that declaring the number of winning and losing trades made by a trading system is, in fact, promotion of the financial benefits associated with that trading system. The CFTC alleges that in several advertisements placed in the *Investor's Business Daily,* Heffernan promoted the effectiveness of his Accutrader System. For example, he asserted in an advertisement that he had documented "372 Winning Trades, 3 Losing Trades, [in the] Last 120 Trading Days." (Doc. No. 1 ¶ 27.) [34] These adver-

---

**32.** Although the CFTC alleges that paragraphs 21–23 violate § VI.3(c) of the September 6 order (Doc. No. 1 ¶ 53), the conduct set forth in these paragraphs does not involve the promotion of any financial benefits associated with the Accutrader System. Rather Heffernan's statements indicate that he traded on his own personal account using the Accutrader System. This conduct does not violate § VI.3(c) of the CFTC's order.

**33.** The statements are as follows:

1. "I have never had a losing day in the Live Trading Room on the Accutrader Trades." (Pl.'s Ex. F at 1.)

2. "The results are documented and recorded and can be proven with time and sales data." (*Id.*)

3. "The total including all of the above trades taken in the trading room is also doing very good. The trading room has had 372 winning trades and 31 losing trades since I started the trading room." (*Id.* at 2.)

4. "In other words it is possible to earn $500 per day or $10,000 per month for part time work of a couple hours a day." (*Id.* at 3.)

**34.** Paragraphs 28–30 of the complaint contain no allegations that Heffernan promoted the profitability of any trading system and, thus,

tisements, like the declarations in the May 8 email, promote the financial benefits of a trading system. Therefore, Heffernan should have included a risk disclosure in accordance with the September 6, 2000 CFTC order; Heffernan's failure to do so violated § VI.3(c) of that order.

## IV. CONCLUSION

The CFTC's motion for summary judgment (Doc. No. 21) is **GRANTED IN PART** and **DENIED IN PART**. Defendant Heffernan violated (1) 7 U.S.C.A. § 6o (1)(A) and 17 C.F.R. § 4.41(a)(1) for the acts outlined in § III.A of this Order, (2) 17 C.F.R. § 4.41(b) for the acts outlined in § III.B of this Order, (3) 17 C.F.R. § 4.16 for the acts outlined in § III.C of this Order, and (4) the CFTC's September 6, 2000 order as set forth in § III.D. A hearing will be held to determine the remedy for Heffernan's violations.

do not form the basis for a violation of § VI.3(c) of the CFTC's order.